In re KEYSTONE FOODS, INC., Debtor.

**GLENSHAW GLASS COMPANY, as Assignee of Keystone Foods, Inc., Plaintiff,**

v.

**The ONTARIO GRAPE GROWERS MARKETING BOARD and Agricultural Products Board of Agriculture, Canada, Defendants.**

Bankruptcy No. 89–00318E.
Adv. No. 90–0108.

United States Bankruptcy Court,
W.D. Pennsylvania.

Sept. 22, 1992.

William E. Kelleher, Jr., and Dennis R. McEwen, Pittsburgh, Pa., for plaintiff.

Geff Blake, Philadelphia, Pa., for defendants.

## OPINION

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Keystone Foods, Inc. ("Keystone" or "Debtor"), a food processor located in North East, Pennsylvania, filed its voluntary Petition under Chapter 11 of the Bankruptcy Code on June 9, 1989. On June 5, 1991, the Court entered an Order (the "Order") approving a Settlement Agreement between Keystone and its secured creditors, Glenshaw Glass Company ("Glenshaw") and the National Bank for Cooperatives ("CoBank"), the effect of which was to distribute all of Keystone's assets to the secured creditors.

As part of the Order, Keystone assigned to Glenshaw all claims it had against the Ontario Grape Growers Marketing Board ("Marketing Board") and the Agricultural Products Board of Agriculture, Canada ("APB") or (collectively "Defendants"). Glenshaw now pursues this cause of action in its own name as assignee of the Debtor.

Glenshaw seeks to recover preferences pursuant to 11 U.S.C. § 547 and improper setoffs pursuant to 11 U.S.C. § 553. Presently before the Court are cross-motions for summary judgment. With the exception of one issue, we find that there are no material facts in dispute and that summary judgment is appropriate except for that single issue.

### Facts

Keystone had a long-standing relationship with the APB and the Marketing Board which serves as an agent of the APB. As of August 31, 1988, Keystone owed Defendants in excess of $400,000 for purchases of grapes on open account. Keystone and the Defendants entered into a Processing and Storage Agreement on September 15, 1988 in which Keystone agreed to process and store certain grapes owned by the Defendants and to deduct Keystone's charges for storage from the amount owed the Defendants. A second contract entitled Purchase Agreement, executed at the same time, provided for Keystone to retain for purchase certain quantities and varieties of Defendants' product. Keystone was not to use any of the Defendants' product prior to the issuance of a written stock release.

In February, 1989, Keystone made a single purchase under the Purchase Agreement in the amount of $93,325. Keystone made cash payments toward this purchase on March 2 and March 6, 1989 totalling $51,136.

As of March 11, 1989, the first day of the preference period,[1] Keystone owed Defendants $42,189 from the February, 1989 purchase. Through credits for storage services, Keystone had reduced the August 31, 1988 balance of over $400,000 to $42,923.97, so that the total owed Defendants as of March 11, 1989 was $85,112.97 ($42,189 plus $42,923.97).

During the Preference Period, Keystone invoiced the Defendants for storage charges as follows:

---

1. The parties agree that the period of March 11, 1989–June 9, 1989 constitutes the preference period ("Preference Period").

| | |
|---|---|
| Invoice dated March 30, 1989 for March, 1989 storage charges | $20,394.66 |
| Invoice dated April 19, 1989 for April, 1989 storage charges | 20,265.52 |
| Invoice dated April 28, 1989 for May, 1989 storage charges | 19,919.52 |
| Total | $60,579.70 |

As of April 28, 1989, after deduction of Keystone's invoices for storage services, the Defendants claimed a balance due in the amount of $24,533.27.

Contrary to the terms of the Purchase Agreement, Keystone began processing a quantity of the Defendants' product without first obtaining a written stock release which the Defendants discovered upon receipt of Keystone's April 28, 1989 inventory report. Keystone's unauthorized use of Defendant's product commenced in April, 1989, after the commencement of the Preference Period. After the Defendants advised Keystone of the discrepancy, Keystone halted the process and agreed to hold Defendants' product segregated and in a separate tank until the product was formally released. On May 5, 1989, Defendants issued a stock release for the product and invoiced Keystone the amounts of $67,053.16 and $18,136.53, totalling $85,189.69. With the addition of the May 5 invoices, the Defendants claimed a balance due of $109,722.96.

Keystone proposed a method of repayment to the Defendants. On May 17, 1989, Keystone proposed to blend $51,868.80 of its own product with $85,332.19 worth of the Defendants' product, resulting in a blended product (the "Blend") with a value of $156,600, including an anticipated profit of $19,399.01. Keystone proposed that the Blend would be the property of the Defendants; that when the Blend was sold to a third party, the third party would pay the Defendants directly; and that the Defendants would apply $85,322.19 to pay for Defendant's product used, and would apply $71,267.81 to Keystone's account—the value of Keystone's product in the Blend ($51,868.80), plus a profit of $19,399.01. On May 18, 1989, the Defendants approved the transaction ("Blending Transaction").

After the bankruptcy filing, the Blend was sold to a third party who paid the sale price directly to the Defendants. Defendants subsequently credited Keystone's account for $51,868.80. Keystone received no credit for the anticipated profit of $19,399.01.

In Count I of its Amended Complaint, Glenshaw seeks to recover $60,579.70 (the Keystone invoices for storage services) which Glenshaw asserts was improperly set off by Defendants against Keystone's antecedent debt during the Preference Period. Alternatively, Glenshaw seeks to recover the amount as a preference.

We find that while $54,000.78 worth of storage service rendered by the Debtor is a preference, it is protected to the extent of $37,294.09 by the transfer of $85,290.69 of Defendant's product to the Debtor (i.e., the May 5, 1989 stock release) *after* the Debtor had rendered $37,294.09 worth of storage service during the Preference Period.

In Count II, Glenshaw seeks to avoid the transfer of Keystone's interest in property valued at $71,267.81 as a preference or to recover as an improper setoff $71,267.81 or, in the alternative, at least $51,868.80. Glenshaw further requests interest from June 9, 1989.

We find that $51,868.80 of Debtor's product was used during the Preference Period to reduce Debtor's debt to Defendant and is therefore a preference. Conflicting assertions of fact require an evidentiary trial

to resolve Plaintiff's claim to an additional $19,399.01.

The Defendants' reply with a barrage of defenses. Defendants assert that the performance of storage services did not constitute a transfer of property; that due to the terms of the Processing and Storage Agreement, no account receivable was generated; that any transfers were made in the ordinary course of business; that Defendants provided new value to the Debtor; that Defendants properly exercised their right of recoupment; and that the Defendants properly exercised the right of set-off.

### Discussion

### Recoupment

■ Recoupment applies where the creditor's claim against the Debtor and the Debtor's claim against the creditor arise out of the same contract or transaction. *See In re University Medical Center,* 973 F.2d 1065 (3d Cir.1992); *Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984); *In re Holford,* 896 F.2d 176, 178 (5th Cir.1990); *In re Jones,* 122 B.R. 246, 248 (W.D.Pa.1990).

■ Keystone's debt to Defendants against which the storage charges were credited arose from Keystone's purchase of grapes on open account prior to execution of the Processing and Storage Agreement. The open account arose from a transaction which was prior to and separate from the Processing and Storage Agreement under which the credit arose.

Similarly, the Defendants' agreement to allow the Blending Transaction with the understanding that all proceeds from the sale would be applied to Keystone's debt is a separate and distinct transaction from the prior sales to Keystone on open account from which the debt arose.

In both instances, the antecedent debt and the credit arose from separate and distinct transactions. Thus, the Defendants' recoupment defense must fail.

### Setoff

■ The setoff provision of the Bankruptcy Code, 11 U.S.C. § 553, is in effect a miniature preference section which validates certain preferences. *In re Prescott,* 805 F.2d 719 (7th Cir.1986). Where both improper setoff and preference are alleged, it is proper to first examine the setoff provisions to determine whether the property received is protected by that provision. *Durham v. SMI Indus. Corp.,* 882 F.2d 881 (4th Cir.1989). To the extent that the setoff is improper, the transfer constitutes a preference which we examine under the preference provision, 11 U.S.C. § 547. *Durham v. SMI Indus. Corp.,* 882 F.2d at 882.

■ Under § 553(b), prepetition setoffs within the Preference Period that improve the offsetting creditor's position are disallowed. *Braniff Airways, Inc. v. Exxon Co., USA,* 814 F.2d 1030 (5th Cir.1987). § 553 provides a mechanical test to determine the improvement in position:

§ 553. Setoff.

(b)(1) . . . if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

. . . .

11 U.S.C. § 553.

■ In the present matter, the Defendants had no mutual debt owing to Keystone on the day the Preference Period started and, therefore, the insufficiency 90 days before the filing of the petition was $85,112.97. The mutual debt that the Defendants owed to Keystone arose during

and was setoff during the Preference Period. The entire amount of the setoff, $60,-579.70, is thus an improper setoff because the insufficiency was reduced by the entire amount as shown by the balance ($24,-533.27) which the Defendants claimed was due after the setoffs.

The sole effect of the setoff procedure described in the Processing and Storage Agreement, the crediting of Keystone's storage charges against antecedent debt owed to the Defendants, was to give Defendants' unsecured claims preference over other creditor's claims, which is not permitted under § 553.

 Defendants also assert that the monies they received from the postpetition sale of the Blend to a third party for which Defendants gave Keystone a credit of $51,-868.80 constitutes a proper setoff against the amounts Keystone owed Defendants from prepetition transactions. A creditor cannot setoff funds received postpetition against prepetition amounts owed by a debtor. *See In re University Medical Center*, 973 F.2d 1065 (3d Cir.1992).

Therefore, the setoff defense fails.

### *Preference*

 Glenshaw has the burden of proof to establish each of the elements of its preference claims. 11 U.S.C. § 547(g). Glenshaw must establish that:

(1) an interest of the Debtor in property was transferred;

(2) the transfer was made to or for the benefit of the Defendants;

(3) the transfer was for or on account of an antecedent debt owed by the Debtor before the transfer was made;

(4) the Debtor was insolvent at the time of the transfer;

(5) the transfer occurred within ninety days before the bankruptcy petition was filed; and

(6) the transfer permitted the Defendant to receive more than it would have received upon liquidation of the Debtor under the Bankruptcy Code.

11 U.S.C. § 547(b).

Defendants assert that the Debtor's provision of storage services does not constitute the transfer of an interest in property. Defendants further assert that the provision of storage services by the Debtor did not allow Defendants to receive more than it would have received in a Chapter 7 liquidation nor did it improve Defendants' position prior to the filing of the Debtor's petition.

 The performance of services creates a right to be paid for those services. If such services are not paid for at the time performed, an account receivable is created for the amount due. Accounts receivable are a property interest of the Debtor and are susceptible to preferential transfers. *In re Marketing Resources Int'l. Corp.*, 41 B.R. 580, 582 n. 5 (Bankr. E.D.Pa.1984). The storage charges incurred by the Defendants created a right of Keystone to be paid for its services. Defendants' crediting of charges for services performed during the Preference Period against prior debt was a preferential transfer.

The account receivable is generated by the day to day storage. The date of invoice is immaterial. Therefore, the Defendants received preferential transfers calculated as follows: March 11—March 31, 21/31 × $20,394.66 or $13,815.74; April, $20,265.52; May, $19,919.52; or a total of $54,000.78.

 Defendants assert that because the parties had entered into the Processing and Storage Agreement in September, 1988, Keystone's estate was not diminished by Defendants' crediting of the storage charges against antecedent debt. The Processing and Storage Agreement memorialized the agreement between Keystone and the Defendants to allow the charges for storage services performed to be setoff. The Processing and Storage Agreement cannot be relied upon as justification for violating the Bankruptcy Code's prohibition against such setoffs. If Keystone had been paid for the storage services performed during the Preference Period, the estate would have been $54,000.78 greater and the Defendants would not have im-

proved their position to the detriment of other creditors. None of the unsecured creditors will receive a distribution from this estate. Thus, it is clear that the Defendants received more by virtue of the transfer than they would have received upon liquidation.

■ With respect to the Blending Transaction, Defendants assert that there was no transfer to or for the benefit of the Defendants since Keystone first proposed the transaction for its benefit. The position of the Defendants is without merit. Keystone's goal was to generate additional amounts to be applied to its debt with the Defendants. The effect of the transfer was to allow the Defendants to apply the proceeds from the sale of Keystone's inventory to prior debt.

Defendants also assert that Glenshaw has not established that the blending of the product actually took place prior to the bankruptcy filing which is a necessary element of the preference action. This is not a material question. If the blending had been done postpetition, the transfer may be avoided under 11 U.S.C. § 549, which provides for the avoidance of a transfer of property of the estate that occurs after the commencement of the case.

The Blending Transaction, although agreed upon between Keystone and the Defendants, allowed the Defendants to obtain valuable property of the Debtor and to apply the value of the property against the Debtor's antecedent debt in a manner which placed Defendants in a preferential position ahead of all other unsecured creditors.

■ Glenshaw has, however, not substantiated that the $19,399.01 profit which Keystone anticipated from the Blending Transaction actually materialized. We believe there are material questions of fact as to whether Keystone used an additional 6500 pounds of Defendants' product in the Blend which reduced or eliminated the anticipated profit.

■ The Defendants argue that even if preferences occurred, 11 U.S.C. § 547(c) prevents avoidance of the transfers. § 547(c) provides:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

. . . . .

(4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—

(A) not secured by an otherwise unavoidable security interest; and

(B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

. . . . .

11 U.S.C. § 547(c).

Defendants assert that Keystone performed storage services and the value of the services was credited in the ordinary course of business. Initially, Defendants sold product to Keystone on open account. In August, 1988, Keystone owed Defendants in excess of $400,000 for purchases from the 1987 and 1988 crop years. In September, 1988, the parties entered into the Processing and Storage Agreement for two reasons—to apply the fees earned under the agreement against Keystone's accounts and to assure adequate processing capacity for grapes. We find that the ordi-

nary course of business between Keystone and the Defendants was established in the period prior to the Processing and Storage Agreement. The Processing and Storage Agreement which provided for the application of Keystone's storage charges to its debt was a significant variation from the ordinary course of business between the parties and is the type of unusual action § 547 is designed to prevent. *See In re J.P. Fyfe, Inc.*, 891 F.2d 66, 69–70 (3d Cir. 1989).

■ Similarly, Defendants' position that the Blending Transaction was done in the ordinary course of business is without merit. The parties had not previously entered into this type of transaction. The transaction was designed as a vehicle to repay Keystone's antecedent debt.

Defendants assert § 547(c)(1) as a defense which provides an exception for transfers that are part of a contemporaneous exchange of new value between a debtor and creditor.

■ Defendants' argument that the Blending Transaction was a contemporaneous exchange for new value is unpersuasive. Defendants do not dispute that the value of Keystone's product in the Blend was used to pay off Keystone's antecedent debt. The antecedent debt was created prior to contemplation of the Blending Transaction. At the time the debt was incurred, it was not a consideration that repayment would be made in the form of a credit from the Blending Transaction and thus, the Blending Transaction was not a contemporaneous exchange for new value.

■ Similarly, the crediting of Keystone's storage invoices to Keystone's debt is not a contemporaneous exchange for new value. The parties did not contemplate or treat it as such.

■ We find a different situation, however, under § 547(c)(4) which provides an exception to the preference provisions for new value to the extent new value is given to a debtor *after* the time of the preferential payment. The stock release of May 5, 1989 was a delivery of goods on credit to Keystone on that date. That $85,290.69

delivery was *after* the preferential March storage service (worth $13,815.74) and *after* the April storage service (worth $20,265.52) and *after* five days of the May storage (worth $5/31 \times \$19,919.52$ or $3,212.83).

Thus, the Defendants are entitled to a new value credit of $37,294.09 ($13,815.74 plus $20,265.52 plus $3,212.83). On the storage charges, Glenshaw is entitled to a judgment in the amount of $16,706.69 ($54,000.78—37,294.09).

■ The Blending Transaction was not a part of the storage transaction. It was a new and separate device conceived by Keystone as a means of paying down its debt to Defendants. Therefore, no part of the $85,290.69 of Defendant's goods may be used to protect Defendant from the effect of the preferential payment aspect of the Blending Transaction.

### Conclusion

#### Count I

The application to prior debt of Keystone's invoices for storage services performed during the Preference Period in the amount of $54,000.78 is a preferential transfer; that preference, however, is insulated from Glenshaw's attack to the extent of the Defendants' subsequent advance of new value in the amount of $37,294.09. Thus, Glenshaw will be granted judgment in the amount of $16,706.69 on Count I of its Amended Complaint, together with interest at the rate of 6% from May 31, 1989.

#### Count II

We find no merit to any of the defenses raised by the Defendants to Glenshaw's preference claim resulting from the Blending Transaction. We are, however, unable to determine whether the anticipated profit actually materialized, and therefore, will grant Glenshaw judgment on Count II of its Amended Complaint in the amount of $51,868.80, together with interest at the rate of 6% from August 11, 1989, the date on which the proceeds from the sale of the Blend was due from the third party purchaser. Further hearings will be required

to determine the extent, if any, to which the anticipated profit actually materialized.

## ORDER

This 22 day of September, 1992, in accordance with the accompanying OPINION, it shall be, and hereby is, ORDERED as follows:

1. Judgment is entered in favor of the Plaintiff, Glenshaw Glass Company, as Assignee of Keystone Foods, Inc. and against Defendants, Ontario Grape Growers Marketing Board and Agricultural Products Board of Agriculture Canada, on Count I of the Amended Complaint in the amount of $16,706.69 plus interest at the rate of 6% from May 31, 1989.

2. Judgment is entered in favor of Plaintiff, Glenshaw Glass Company, as assignee of Keystone Foods, Inc., and against Defendants, Ontario Grape Growers Marketing Board and Agricultural Products Board of Agriculture Canada, on Count II of the Amended Complaint in the amount of $51,868.80, plus interest at the rate of 6% from August 11, 1989.

3. A further hearing will be held to determine whether Glenshaw is entitled to recover an additional amount representing Keystone's profit on the Blending Transaction.

4. The parties shall advise the Court, within 30 days, of the anticipated time required for trial of the remaining issue.

5. This Order is interlocutory and not subject to appeal nor may it be used as a basis for execution upon the judgments herein issued, pending final resolution of the matter upon further order of this Court.