In re KAYPRO, a California Corporation, Debtor.

Arrow Electronics, Inc., Appellant,

v.

Howard Justus, Trustee, Appellee.

BAP No. SC–97–1183–RiJRY.
Bankruptcy No. 90–01609–M7.
Adversary No. 93–90784.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Sept. 23, 1998.

Decided Jan. 21, 1999.

Gary E. Scalabrini, Gibbs, Giden, et al., Los Angeles, CA, for Arrow Electronics, Inc.

Michael T. O'Halloran, Law Offices of Michael T. O'Halloran, San Diego, CA, for Howard Justus, trustee.

Before RIBLET,[1] JONES, and RYAN, Bankruptcy Judges.

## OPINION

RIBLET, Bankruptcy Judge.

Appellant, Arrow Electronics, Inc. ("Arrow"), appeals from a series of decisions of the bankruptcy court, namely, the granting of partial summary judgment in favor of the Trustee, which judgment was based, in part, on the finding that the ordinary course of business exception did not apply; the granting of the Trustee's motion for reconsideration of a subsequent summary judgment in favor of Arrow, which decision was based on Fed.R.Civ.P. 59(e) and *In re Hanna,* 72 F.3d 114 (9th Cir.1995); and, after trial, the finding that the Debtor was insolvent at the time of its transfers to Arrow. We AFFIRM.

## I. FACTS

The Debtor manufactured personal computers and precision instruments. Arrow supplied electronic components to the Debtor. The Debtor became delinquent in

---

1. Hon. Robin L. Riblet, Bankruptcy Judge for the Central District of California, sitting by designa- tion.

amounts due and owing to Arrow in 1988 and 1989, resulting in a restructuring of the debt in the form of a promissory note in the amount of $117,290.06, and the execution of a personal guarantee by Andrew Kay, the Debtor's major stockholder. Between March 30 and September 12, 1989, the Debtor made a total of $58,645.02 in payments to Arrow ("transfers") under the note.

The Debtor filed its Chapter 11 [2] petition on March 1, 1990. On January 22, 1992, a Chapter 11 Trustee was appointed. The case was subsequently converted to a case under Chapter 7 on June 9, 1992. The Trustee commenced the instant adversary action against Arrow on September 17, 1993, seeking to avoid the transfers as preferential or fraudulent under § 547, alleging that the transfers in the year prior to filing of the Debtor's petition were avoidable because such transfers benefitted Mr. Kay, an insider of the Debtor.

The bankruptcy court considered cross motions for summary judgment, and on July 27, 1995, it granted partial summary judgment in favor of the Trustee as to all elements of § 547(b), with the exception of the issue of the insolvency of the Debtor.

On October 6, 1995, Arrow filed its second motion for summary judgment contending that the adversary proceeding was barred by the expiration of the statute of limitations of § 546, as that statute was interpreted under *In re IRFM*, 65 F.3d 778 (9th Cir.1995). The bankruptcy court granted the motion on December 20, 1995. On December 29, 1995, the Ninth Circuit issued its decision in *In re Hanna*, 72 F.3d 114 (9th Cir.1995), which clarified *IRFM*, as well as other Ninth Circuit decisions interpreting § 546. The issuance of the *Hanna* opinion prompted the Trustee to file a motion for reconsideration of the December 20, 1995 order. The Trustee's counsel served Arrow with the motion on January 2, 1996, the day after a federal

holiday, but did not file the motion with the court until January 3, 1996. In addition to arguing that *Hanna* did not apply, Arrow opposed the Trustee's motion for reconsideration on grounds that the motion was untimely under amended Fed.R.Civ.P. 59(e).[3] The bankruptcy court ruled that the Trustee's motion was timely, held that *Hanna* controlled, and granted the motion, effectively vacating the prior summary judgment in favor of Arrow.

Thereafter, a trial was held on the issue of the Debtor's insolvency in December 1996. The bankruptcy court entered judgment in favor of the Trustee on March 4, 1997, finding that all elements required by § 547(b) to avoid the transfers were established. Judgment in the amount of $58,645.02 was entered against Arrow. Arrow timely appealed.

## II. ISSUES

Three issues are presented on appeal. First, whether the bankruptcy court erred in granting partial summary judgment in favor of the Trustee based on the decision that the ordinary course of business exception did not apply. Second, whether the bankruptcy court abused its discretion in granting the Trustee's motion for reconsideration based on Fed.R.Civ.P. 59 and *Hanna*. And third, whether the bankruptcy court erred in finding that the Debtor was insolvent at the time of the transfers.

## III. STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo*. *Bellus v. United States*, 125 F.3d 821, 822 (9th Cir.1997); *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir.1996). Whether a transaction comports with the standards for business conduct within an industry is a factual determination which is reviewed for clear error. *Luper v. Columbia Gas of Ohio, Inc. (In re Carled,*

---

2. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

3. One month prior to the filing of Trustee's motion for reconsideration, the amended version of

Fed.R.Civ.P. 59 became effective. Whereas the former Rule 59 required that a motion for new trial, or to alter or amend judgment, be "served" not later than 10 days after entry of the judgment, the amended rule required such a motion be "filed" not later than 10 days after entry of the judgment.

*Inc.),* 91 F.3d 811, 813 (6th Cir.1996) (citing *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir.1989)). The application of the legal standard to the facts, however, is reviewed *de novo. Carled,* 91 F.3d at 813. "To the extent that questions of fact cannot be separated from questions of law, we review these questions as mixed questions of law and fact applying a *de novo* standard." *Jodoin v. Samayoa (In re Jodoin),* 209 B.R. 132, 135 (9th Cir. BAP 1997) (citing *Ratanasen v. California Dep't of Health Servs.,* 11 F.3d 1467, 1469 (9th Cir.1993)).

▮ This court reviews the granting or denial of a motion for reconsideration for an abuse of discretion. *Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc.,* 84 F.3d 1186, 1192 (9th Cir. 1996).

▮ Insolvency being a question of fact, the findings of the bankruptcy court as to a debtor's insolvency are reviewed for clear error. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30, 35 (2nd Cir.1996).

## IV. DISCUSSION

### A. Application of the Ordinary Course of Business Exception

Arrow argues that the Debtor and its creditors should be permitted to use the terms and methods of payments that are ordinary under the circumstances, including the restructure of debt if debt rescheduling is an ordinary and usual practice within the industry or between the parties. Thus, Arrow contends that the lower court's decision that the restructure of debt is outside the ordinary course of business exception as a matter of law was in error. At a minimum, Arrow argues, the determination of whether the transfers were made in the ordinary course of business is a genuine issue of fact which

defeats the Trustee's motion for partial summary judgment.

▮ The ordinary course of business exception is codified at § 547(c)(2).[4] To qualify for the ordinary course of business exception, a creditor must prove that: 1) the debt and its payment are ordinary in relation to past practices between the debtor and this particular creditor; and 2) the payment was ordinary in relation to prevailing business standards. *Mordy v. Chemcarb, Inc. (In re Food Catering & Hous., Inc.),* 971 F.2d 396, 398 (9th Cir.1992) (citing *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.),* 957 F.2d 239, 243–44 (6th Cir.1992)). The transferee has the burden of proving the defense and must prove each of the three elements by a preponderance of the evidence. *Fred Hawes,* 957 F.2d at 242, 244.

All of the evidence as to the issue of the ordinary course of business defense was submitted by Arrow. At the hearing on the cross motions for summary judgment on May 4, 1995, Arrow's counsel argued that the statement of facts submitted with its motion was sufficient to resolve the entire case. The Trustee cross-moved for summary judgment, adopting substantially all of Arrow's statements of fact.

The evidence considered by the lower court consisted of the transcript of Mr. Kay's deposition and the exhibits thereto, and the declaration of Peter Griesbach and the exhibits thereto. Mr. Kay, a major stockholder and the President and Chairman of the Board of the Debtor, testified that the Debtor conducted business with Arrow for many, many years on a 30– or 60–day open book account. Most of the Debtor's vendors worked on the same 30– or 60–day open book account basis. The Debtor made regular and timely payments to Arrow in the early years but not after the Debtor started losing money in 1988 and 1989. Mr. Kay further testified that he signed "quite a number" of personal guaranties in 1988 and 1989, after the

4. Section 547(c)(2) provides that the trustee may not avoid a transfer to the extent that such transfer was:
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 (C) made according to ordinary business terms.
11 U.S.C. § 547(c)(2).

Debtor started experiencing hard economic times, and that most of the Debtor's vendors required personal guaranties and promissory notes for the continued delivery of product and for the avoidance of lawsuits. Mr. Kay denied any personal knowledge of whether his signing personal guaranties and promissory notes was taking place industry wide, and specifically limited his testimony to what had happened to him personally. Mr. Kay also testified that he was never asked to give a personal guarantee to a creditor if the Debtor was current on its accounts payable.

The deposition exhibits included numerous invoices from Arrow to the Debtor, several collection letters to the Debtor from Arrow's legal counsel, the Promissory Note in favor of Arrow in the amount of $117,290.06, dated March 30, 1989, the Personal Guarantee in favor of Arrow dated March 30, 1989, copies of the Debtor's checks made payable either to Arrow or its legal counsel and miscellaneous payment transmittal and acknowledgment letters, as well as a Promissory Note in favor of Schweber Electronics Corporation (another of the Debtor's creditors), dated March 28, 1989, and copies of the Debtor's checks made payable to Schweber Electronics.

Also submitted as evidence was the declaration of Peter Griesbach, the Credit Manager of Arrow. Mr. Griesbach declared that as part of its ordinary course of business, Arrow routinely entered into workouts or debt restructuring agreements which required Arrow's customers to consolidate outstanding debts and execute promissory notes. Mr. Griesbach testified, "These types of agreements are common in the industry and are routinely used by ARROW." He further stated that Arrow would often require securi-

ty for a promissory note in various forms, including personal guaranties. There was no cross examination of Mr. Griesbach at the hearing. The exhibits attached to Mr. Griesbach's Declaration included numerous invoices from Arrow to the Debtor, the Arrow promissory note and personal guarantee.

On July 26, 1995, the bankruptcy court issued its Memorandum Decision finding that the promissory note which restructured the debt was executed less than a year before the bankruptcy petition was filed. The court declined to ascribe to *Richardson v. Philadelphia Hous. Auth. (In re Richardson)*, 94 B.R. 56 (Bankr.E.D.Pa.1988) and *In re Magic Circle Energy Corp.*, 64 B.R. 269 (Bankr. W.D.Okla.1986), which the court believed represented the minority view. Because the promissory note was executed within the one-year preference period, the bankruptcy court held, as a matter of law, that payments made pursuant to a restructuring agreement cannot be in the ordinary course of business.

In so ruling, the bankruptcy court cited the cases which it believed represented the majority view: *White v. Bradford (In re Tax Reduction Inst.)*, 148 B.R. 63 (Bankr.D.C. 1992); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 127 B.R. 722 (Bankr. W.D.N.Y.1991)[5]; *Matter of J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66 (3rd Cir.1989); *Keystone Foods, Inc. v. Ontario Grape Growers Mktg. Bd. (In re Keystone Foods, Inc.)*, 145 B.R. 502 (Bankr. W.D.Pa.1992); and *Gold v. Kubicki (Matter of Red Way Cartage Co., Inc.)*, 84 B.R. 459 (Bankr.E.D.Mich.1988).

Of the cases cited by the bankruptcy court below, only *Red Way Cartage*[6] and *Keystone*,[7] both bankruptcy court decisions, ap-

---

5. Subsequent to the bankruptcy court's citation to *Roblin*, the *Roblin* decision was affirmed by the Second Circuit in *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30 (2nd Cir. 1996).

6. In *Red Way Cartage*, a debtor's payments of lease arrears under a promissory note did not come within the ordinary course of business exception. The court stated, "[P]ayments made pursuant to a settlement agreement, which appear to be the result of an antecedent debt and prior dispute between the parties, are simply not in the ordinary course of business." 84 B.R. at

461–62 (citing *Carrier Corp. v. MID Corp. (In re Daikin Miami Overseas, Inc.)*, 65 B.R. 396, 398 (S.D.Fla.1986)).

7. In *Keystone*, the transferee sold product on an open account to a debtor engaged in the business of processing food. After the debtor became delinquent in excess of $400,000, the parties entered into a Processing and Storage Agreement for the purpose of applying the fees earned against the debtor's accounts and to assure adequate processing capacity for grapes. The court concluded:

pear to hold that as a matter of law, restructuring agreements cannot be in the ordinary course of business. *Roblin* was later affirmed by the Second Circuit in *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),* 78 F.3d 30 (2nd Cir.1996). However, on appeal, the Second Circuit specifically declined to adopt a blanket rule that restructuring agreements were outside the ordinary course of business as a matter of law, stating:

> We decline to adopt a rule that payments made pursuant to debt restructuring agreements, even when the debt is in default, can never be made according to ordinary business terms as a matter of law. That determination is a question of fact that depends on the nature of industry practice in each particular case, a factual inquiry that is appropriately left to the bankruptcy court.

*Roblin,* 78 F.3d at 41.

In the *Tax Reduction Inst.* case, also cited by the lower court, the Chapter 7 Trustee sought to avoid preferential and fraudulent post-petition transfers to or on behalf of the debtor's president and secretary, who were insider guarantors. The court made a close examination of the facts, noting a long history of the debtor's borrowings of this nature and the creditor's history of making commercial loans. Although the court believed the restructuring was simply a continuation of a pre-existing debt, the court found that there was no prior history of accepting late payments of interest only and deferring payment of principal. "By changing the terms of their contract in the midst of the debtor's financial difficulties and during the one-year preference period, the parties cannot make regular that which would otherwise be non-ordinary." 148 B.R. at 73. The transfer was found not in the ordinary course of business.

We find that the ordinary course of business between Keystone and the Defendants was established in the period prior to the Processing and Storage Agreement. The Processing and Storage Agreement which provided for the application of Keystone's storage charges to its debt was a significant variation from the ordinary course of business between the parties and is the type of unusual action § 547 is designed to prevent.

145 B.R. at 510 (citing *Fyfe,* 891 F.2d at 69–70).

In making its determination, the court in *Tax Reduction Inst.* distinguished *Magic Circle* from *Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.),* 82 B.R. 1 (Bankr.D.Mass.1988), pointing out that in *Magic Circle,* terms of the restructure were negotiated long before the preference period, whereas in *Gull Air,* the terms were renegotiated within the preference period.[8]

The bankruptcy court below also cited the *Fyfe* case. In that case, the Third Circuit examined the facts, noting that "[w]hether or not a debtor made a particular payment in the ordinary course of business is a factual determination which a reviewing court should not set aside unless it is clearly erroneous." 891 F.2d at 70. The parties' original terms of payment were 60–day, typical in the industry. The transferee, however, changed these payment terms, and made a new deal which imposed terms and constraints not previously present. The prepetition payment was found not made in the ordinary course of business.

■ Of those cases dealing with the issue of whether payments made pursuant to restructuring agreements are in the ordinary course of business, the panel finds that the better reasoned approach is that taken by the Second and Third Circuits in *Roblin* and *Fyfe,* which held that such determination is a question of fact that depends on the nature of industry practice. Applying this authority, we find that the bankruptcy court below made a clear error when it held that as a matter of law, payments made under a restructuring agreement cannot be in the ordinary course of business. This Panel will therefore review the evidence *de novo* to determine if the facts yield a different result. *See Roblin,* 78 F.3d at 41–43; *cf. Brandt v. Repco Printers & Lithographics (In re*

8. In *Gull Air,* the debtor had financed three airplanes. The lender had commenced a civil action upon the debtor's default and the parties negotiated a workout agreement. The last three payments on the workout agreement fell within the preference period. The court noted that the transfers pursuant to the workout agreement were in response to the civil action and not consistent with the prior transactions between the parties.

*Healthco),* 132 F.3d 104, 108–09 (1st Cir. 1997).

█ The evidence establishes that for many years, and at all times up to the time that the Debtor experienced financial difficulties, the ordinary course of business in the industry was for the Debtor's suppliers to provide electronic components on a 30– or 60–day open book account basis, this being the industry standard. The fact that once the Debtor began experiencing financial difficulties, Mr. Kay had been required to execute promissory notes and personal guaranties in favor of several creditors to insure continued shipment of needed parts, and the fact that Arrow routinely required such notes and guaranties does not establish that such notes and guaranties were ordinary in relation to the past practices between the Debtor and Arrow, or within the ordinary business terms of the industry. *In re Midway Airlines,* 69 F.3d 792, 797–98 (7th Cir.1995) ("Reliance solely on the experience of the creditor renders ineffectual the important dichotomy between the subjective requirements of 11 U.S.C. § 547(c)(2)(A) –(B), which can be satisfied through proof of the parties' own dealings, and the objective requirement imposed by 11 U.S.C. § 547(c)(2)(C), which requires reference to some external datum."); *Fred Hawes,* 957 F.2d at 246 n. 7 (A creditor's evidence of its own dealings with other debtors, although relevant, was insufficient to prove "ordinary business terms" by a preponderance of the evidence.); and *Roblin,* 78 F.3d at 43 (The behavior of the parties cannot be sufficient in and of itself to sustain the creditor's burden of proof with respect to ordinary business terms in the industry.).

Nor can the ordinary business terms in the industry be established by Mr. Griesbach's bald statement that promissory notes were common in the industry. Mr. Griesbach's self-serving declaration provided *no foundation* establishing his personal knowledge or experience in the industry. Indeed, Mr. Griesbach's declaration attested only to his employment as credit manager with Arrow; no other employment information, qualifications or experience were set forth in his declaration. Without any additional evidence in the record, and absent any foundation establishing Mr. Griesbach's personal knowledge or experience in the industry beyond his employment with Arrow, Mr. Griesbach's statements as to industry practices cannot be given any weight. Thus, the record is devoid of any competent evidence as to whether restructuring agreements and personal guaranties were utilized within the industry in the ordinary course of business.

To the contrary, the evidence indicates that the industry practice was to supply electronic components on 30– or 60–day open book accounts. The Debtor, under its former business name of Non–Linear Systems, Inc., started doing business with Arrow "many, many years ago," and after its name was changed to Kaypro, the Debtor continued to do business with Arrow. During these many years of doing business, the parties operated on an open book account basis. In contrast to this long-standing practice, the Debtor made the subject transfers under the promissory note for only six months, which is a relatively insignificant portion of the many years during which the parties did business under the 30– or 60–day open book account terms. The record is devoid of any evidence that these parties had engaged in other promissory note arrangements during their history of doing business together. The Debtor deviated from its customary business practice by executing the promissory note and making monthly payments under that note.

The record also includes a number of collection letters from Arrow's legal counsel to the Debtor. These letters directed the Debtor to make arrangements with, and to remit payments directly to Arrow's attorney. Legal action was threatened. This demonstrates an additional deviation in the parties' past payment practices, i.e., the remitting of payments through legal counsel.

Arrow relies heavily on *Magic Circle,* 64 B.R. 269. However, *Magic Circle* is inapposite to the facts at hand. The *Magic Circle* court emphasized that in entering into a workout, the creditor did not gain an advantage over other creditors. Evidence as to the ordinary business terms of the oil and gas industry being "sparse," the court took judicial notice that a workout with a promis-

408

sory note at eight percent payable over seven years was within ordinary business terms. The fact that transfers had been occurring for a lengthy period of time (between execution of the note in September 1983 and the filing of the bankruptcy petition in April 1985) was also significant. Thus, the facts of *Magic Circle* differ considerably from those before this Panel where Arrow in fact gained an economic advantage over other creditors by reason of the personal guarantee executed by Mr. Kay, and where the promissory note was executed less than one year before the bankruptcy petition was filed.

■ We next address Arrow's contention that the existence of genuine issues of material fact precludes the granting of summary judgment on the ordinary course of business defense. This court will affirm a grant of summary judgment only if it appears from the record, after reviewing all the evidence and factual inferences in the light most favorable to the nonmoving party, that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *In re Yarbrow*, 150 B.R. 233, 236 (9th Cir. BAP 1993).

■ The parties had cross-moved for summary judgment and the matter was submitted on Arrow's unopposed record. In Arrow's Opposition to Trustee's summary judgment motion, Arrow raised only three major arguments.[9] At no time did Arrow argue that there were genuine issues of material fact which would preclude a granting of summary judgment. In fact, Arrow's counsel argued precisely the opposite at the hearing by stating, "I was forced to create a separate statement of facts in which I dug through the deposition and discovery, took that burden on myself, and prepared for the Court a separate statement of facts which I think is enough to resolve the entire case." With the exception of one item, the Trustee's

cross motion adopted all of Arrow's statements of fact. The bankruptcy court took the matter under submission on a record which Arrow represented to be complete and sufficient to resolve the entire case. Arrow cannot now be allowed to complain of incompleteness of a record which it not only submitted, but previously had argued was sufficient to resolve the entire case. The Panel may only review matters that were properly raised and decided by the bankruptcy court. *Greenfield Drive Storage Park v. California Para–Professional Servs., Inc. (In re Greenfield Drive Storage Park)*, 207 B.R. 913, 918 (9th Cir. BAP 1997) (citing *In re NSB Film Corp.*, 167 B.R. 176, 180 (9th Cir. BAP 1994) ("Issues that are raised for the first time on appeal will not be considered.")).

The ordinary course of business defense is routinely adjudicated by way of summary judgment motion procedure. *See Healthco*, 132 F.3d 104; *Sulmeyer v. Suzuki (In re Grand Chevrolet)*, 25 F.3d 728 (9th Cir.1994); *Gull Air*, 82 B.R. 1; and *Food Catering & Hous.*, 971 F.2d 396. In this instance, there is no competent evidence that restructuring agreements were ordinary in the industry. Notwithstanding this lack of evidence as to the industry standard, there is sufficient evidence to demonstrate that the execution of the promissory note and personal guarantee was a deviation from the parties' prior business practices. The record before this Panel does not reflect the existence of any genuine issues of material facts.

Arrow is not appealing any other portions of the Memorandum Decision of July 25, 1995. Thus, the granting of partial summary judgment in favor of the Trustee as to all elements of § 547(b), with the exception of the issue of insolvency of the Debtor, was not in error.

9. First, Arrow argued that the Trustee's cross-motion for summary judgment was untimely. This argument was quickly disposed when Arrow declined the court's offer for a continuance. Arrow's second argument—that there was no evidence of insolvency, was conceded by the Trustee and was the reason that only partial summary judgment was requested and granted. Arrow's last argument—that the Trustee failed to offer

any evidence establishing that Arrow received more than it would have received if the transfers had not been made, and Arrow received payment to the extent provided by the Code—was conceded at the hearing. Arrow's counsel stated, "we initially did attack that we wouldn't receive more. However, after reading counsel's cases that he cited in his reply that's not an issue any longer."

## B. Fed.R.Civ.P. 59(e)

In October 1995, Arrow filed its second motion for summary judgment on the grounds that the adversary proceeding had been filed after the expiration of the statute of limitations of § 546, as that statute was interpreted by the Ninth Circuit in *In re IRFM*, 65 F.3d 778. The court below granted the motion and entered an order thereon on December 20, 1995. On December 29, 1995, the Ninth Circuit issued its decision in *In re Hanna*, 72 F.3d 114, which clarified *IRFM* and other Ninth Circuit decisions interpreting § 546. The pronouncement of the *Hanna* decision prompted the Trustee to file a motion for reconsideration of the December 20, 1995 order.

Arrow argues that amended Fed.R.Civ.P. 59(e),[10] effective December 1, 1995, should have been applied to the Trustee's motion for reconsideration in such a manner as to require the motion to be "filed" not less than 10 days after entry of the December 20, 1995 Order. Because the Trustee filed his motion one day after the expiration of the 10–day period, Arrow contends that the bankruptcy court was without jurisdiction to consider the merits of the motion.

 The facts are not in dispute. The order from which the Trustee sought reconsideration was entered on December 20, 1995, a Wednesday. The Ninth Circuit issued its decision in *Hanna*, on December 29, 1995, a Friday. The Trustee's counsel served by mail the motion to reconsider on January 2, 1996, a Tuesday and the first business day after the New Year's holiday, but did not "file" the motion until January 3, 1996, a Wednesday. Had the motion been filed on January 2, 1996, the Trustee would have been in compliance with the amended Rule 59(e). There is also no dispute that the Trustee was in compliance with the prior version of Rule 59(e).

The Advisory Committee Notes explain the purpose of the 1995 amendments:

> The only change, other than stylistic, intended by this revision is to add explicit time limits for filing motions for a new trial, motions to alter or amend a judgment, and affidavits opposing a new trial motion. Previously, there was an inconsistency in the wording of Rules 50, 52, and 59 with respect to whether certain post-judgment motions had to be filed, or merely served, during the prescribed period. This inconsistency caused special problems when motions for a new trial were joined with other post-judgment motions. These motions affect the finality of the judgment, a matter often of importance to third persons as well as the parties and the court. The Committee believes that each of these rules should be revised to require filing before end of the 10–day period. Filing is an event that can be determined with certainty from court records. The phrase "no later than" is used—rather than "within"—to include post-judgment motions that sometimes are filed before actual entry of the judgment by the clerk. It should be noted that under Rule 5 the motions when filed are to contain a certificate of service on other parties. It also should be noted that under Rule 6(a) Saturdays, Sundays, and legal holidays are excluded in measuring the 10–day period, but that Bankruptcy Rule 9006(a) excludes intermediate Saturdays, Sundays, and legal holidays only in computing periods less than 8 days.

Fed.R.Civ.P. 59 Advisory Committee Notes, 1995 Amendments.

The 1995 amendments were made effective as of December 1, 1995, pursuant to the Order of the Supreme Court adopting and amending the rules, which order stated, in part:

> 1. That the Federal Rules of Civil Procedure for the United States District Courts be, and they hereby are, amended by including therein amendments to Civil Rules 50, 52, 59, and 83.
>
> 2. That the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 1995, and shall govern all proceedings in civil cases thereafter commenced and, insofar as just and practi-

---

**10.** Fed.R.Civ.P. 59 is made applicable to cases under the Bankruptcy Code by Fed.R.Bankr.P. 9023.

cable, all proceedings in civil cases then pending . . .

Order of the Supreme Court of the United States Adopting and Amending Rules, April 27, 1995, *reprinted at Federal Civil Judicial Procedure and Rules* (West 1998 ed.) at 37.

The Trustee's adversary proceeding was commenced on September 17, 1993, thus, this action was "pending" on the effective date of the amended Rule. Therefore, the 1995 amendments govern only "insofar as just and practicable." The bankruptcy court, within its discretion, determined that it would be "entirely unfair" to apply the amended rule when Trustee's counsel served his motion on the first day that he could and filed it the next day. The court also considered the unique circumstances of the series of decisions published by the Ninth Circuit relative to the § 546 statute of limitations, and noted that the *Hanna* decision came "at the last minute." Furthermore, the bankruptcy court was mindful of the amount in controversy, which the court described as a "considerable sum at stake." There was no abuse of discretion in so ruling.

Arrow cites a number of cases for the proposition that the 1995 amendments should be applied to cases which were pending at the time the amendment went into effect. In each of those cases, the trial court applied the version of the rule which permitted the filing of the motion for reconsideration such that the court could proceed to consider the motion on its merits. *Schudel v. General Elec. Co.*, 120 F.3d 991 (9th Cir.1997), *cert. denied*, ── U.S. ──, 118 S.Ct. 1560, 140 L.Ed.2d 792 (1998) (applied the amended versions of Rules 50 and 59 to motions for judgment notwithstanding verdict which were not properly served but were timely filed since no prejudice would result from their application); *Long v. Simmons*, 77 F.3d 878 (5th Cir.1996) (amended rule applied to prisoner's motion to reinstate, which motion was construed as a Rule 59(e) motion, which was timely filed but not served). Arrow also

cites the Panel to *Goodson v. Rowland (In re Pintlar Corp.)*, 133 F.3d 1141 (9th Cir.1998). Although that case is factually dissimilar, it is instructive as to the court's discretionary power in determining whether to apply amended rules retroactively. In *Pintlar*, an amended bankruptcy rule provided for personal jurisdiction over nonresidents in proceedings under the Bankruptcy Code. The Ninth Circuit held that application of the amended rule was just and practicable given the defendants' failure to show that they would have behaved differently had they expected the rule to apply, or that they were otherwise prejudiced.

More directly on point is *Life Ins. Co. of No. Am. v. Von Valtier*, 116 F.3d 279 (7th Cir.1997), wherein the defendant filed a Rule 59(e) motion to alter or amend the previous granting of a summary judgment in favor of the plaintiff. The file stamp on the motion indicated it was received on January 18, 1996, which would have been six days too late. The defendant contended that she had "filed" the motion in chambers on the deadline of January 12. Because the proof of service attached to the motion denoted service on the plaintiff on January 12, the motion was found to have been timely filed. The Seventh Circuit admonished the district judge's handling of the motion, noting that Rule 59(e) had been amended in 1995 to change the trigger date from the date of service to the date of filing "precisely because the Advisory Committee assumed that '[f]iling is an event that can be determined with certainty from court records.'" *Id.* at 283.

Under this case law and the language of the Supreme Court order adopting the amended rules, retroactive application of amended rules to pending cases is wholly discretionary. In this instance, if the amended version is applied, the bankruptcy court is without jurisdiction to modify or alter its prior summary judgment. Fed.R.Civ.P. 6(b);[11] *State of Florida, Dep't of Revenue v.*

---

11. Fed.R.Civ.P. 6(b) provides:
 When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any

time in its discretion (1) with or without motion or notice order the period enlarged if request therefor is made before the expiration of the period originally prescribed or as extended by a previous order, or (2) upon motion

*Brandt (In re Southeast Bank Corp.),* 97 F.3d 476 (7th Cir.1996). The Trustee and the estate would have been greatly prejudiced if the motion for reconsideration was not permitted to be heard on the merits. In contrast, by applying the former version of the rule no prejudice resulted to Arrow since Arrow had been timely served on the tenth day after entry of the Order. The bankruptcy court did not abuse its discretion in refusing to apply the amended version of Rule 59(e).

 As to the merits of the Trustee's motion for reconsideration, the bankruptcy court's finding that *Hanna* controlled was also not clear error. An intervening change of controlling law is grounds for reconsideration of a grant of summary judgment. *School Dist. No. 1J, Multnomah Co., Or. v. ACandS, Inc.,* 5 F.3d 1255, cert. denied, 512 U.S. 1236, 114 S.Ct. 2742, 129 L.Ed.2d 861 (1993). In *Hanna,* the Ninth Circuit clarified its prior holdings in *Ford v. Union Bank (In re San Joaquin Roast Beef),* 7 F.3d 1413 (9th Cir.1993), *Upgrade Corp. v. Government Tech. Servs. (In re Softwaire Centre Int'l),* 994 F.2d 682 (9th Cir.1993), and *Mosier v. Kroger Co. (In re IRFM, Inc.),* 65 F.3d 778 (9th Cir.1995). The Ninth Circuit stated:

> We read *Softwaire Centre, San Joaquin Roast Beef, IRFM,* and the language of section 546(a) together to hold that whenever a Chapter 11 trustee is actually appointed under section 1104, the rule in *San Joaquin Roast Beef* applies, so that "the two-year statute of limitations begins running from the date the first trustee [i.e., the Chapter 11 trustee] is appointed." However, where no actual Chapter 11 trustee is ever appointed, *Softwaire Centre* and *IRFM* apply, and the debtor in possession is the functional equivalent of a Chapter 11 trustee.

> Therefore, under our cases and the pre-amended version of section 546, there are two distinct two-year limitations periods for avoidance actions subject to section 546(a). A debtor in possession gets two years from the date the case is filed. If a Chapter 11 trustee is actually appointed, the limitations period restarts and all trustees get two years from the date that Chapter 11 trustee was first appointed. If no Chapter 11 trustee is appointed, the limitations period expires two years after the date on which the petition was filed.

*Hanna,* 72 F.3d at 117.

Although Congress amended § 546 in 1994,[12] the new provision was made effective for all cases commenced after October 22, 1994. The pre-amended version of § 546 applies here since the Debtor filed its Chapter 11 petition on March 1, 1990, before the effective date of the amended section.

The Chapter 11 Trustee was appointed in this case on January 22, 1992. The Trustee commenced this adversary action in September 1993, well within the two-year limitations period provided to the Chapter 11 Trustee. The instant facts fall squarely within *Hanna.* There was no error in the court's application of *Hanna* to the undisputed facts and the resultant granting of the Trustee's motion for reconsideration.

**C. Insolvency of the Debtor at the Time of the Transfers**

All other elements of § 547(b) having been resolved by summary judgment in favor of the Trustee, the bankruptcy court conducted a trial as to the issue of insolvency.

 The bankruptcy court found that the analysis of the Trustee's expert witness, Mr. Marston, was reasonable and led to the conclusion that the Debtor was insolvent during the entire period of the transfers in question, from March 30 through September 12, 1989, and through the filing of the bankruptcy petition on March 1, 1990.

Arrow contends that the Trustee failed to meet his burden of proof because he did not produce any audited or unaudited financial

---

made after the expiration of the specified period permit the act to be done where the failure to act was the time for taking any action under Rules 50(b) and (c)(2), 52(b), 59(b), (d) and (e), 60(b) and 74(a), except to the extent and under the conditions stated in them.

**12.** Section 546 was amended by the Bankruptcy Reform Act of 1994, Pub.L. 103–394 (Oct. 22, 1994).

statements which would show the insolvency of the Debtor during the months in question; the Trustee used an unconventional and novel approach of dispersing adjustments throughout the year; and because the Trustee improperly assumed the obsolescence of the inventory, since he had no knowledge of what items of inventory became obsolete. Arrow contends that three Securities and Exchange Commission ("SEC") Form 10–Q Reports establish that the Debtor was in fact solvent as of May 31, 1989.

As an initial matter, we note that Arrow's expert agreed that the Debtor was insolvent as of September 1, 1989,[13] six months prior to the filing of the petition on March 1, 1990. Thus it is undisputed that the $9,774.17 transfer made to Arrow after September 1, 1989, was made at a time when the Debtor was insolvent. As to this transfer, the judgment of the bankruptcy court must be affirmed without further discussion.

**\_\_\_\_\_** As to the remaining transfers which fell within the extended preference period under § 547(b)(4)(B), the Trustee has the burden of proof relative to the Debtor's insolvency. The parties agree that to satisfy the element of insolvency in a § 547 action, the Trustee must show that the debtor's liabilities exceeded its assets. *In re Koubourlis*, 869 F.2d 1319, 1321 (9th Cir.1989). The parties also agree that the applicable standard of proof is by a preponderance of the evidence, meaning that it is sufficient to persuade the finder of fact that the proposition is more likely true than not. *In re Arnold and Baker Farms*, 177 B.R. 648, 654 (9th Cir. BAP 1994), *aff'd*, 85 F.3d 1415 (9th Cir.1996).

The remaining transfers by the Debtor to Arrow took place between March 30 and July 25, 1989, a four month period during all or part of which Arrow believed the Debtor may have remained solvent. At trial, each side presented expert testimony of Certified Public Accountants.

The Trustee's expert, Mr. Marston, concluded that the Debtor was insolvent as of March 1, 1989, which conclusion was based on analysis of the independent auditor's report covering the consolidated balance sheets as of September 2, 1988, and September 1, 1989, the Trustee's report and discussions with the Trustee, the SEC filings, various correspondence and information, as well as discussions with the outside auditor. Mr. Marston admitted that his analysis was difficult because the March 1, 1989, date fell six months into the Debtor's fiscal year, and the audited report of September 1, 1989 had made significant inventory audit adjustments of approximately $19 million. Mr. Marston believed it "inconceivable" that 100 percent of these $19 million adjustments occurred during the last quarter of the fiscal year, and thus he allocated the adjustments throughout the fiscal year. He used three methods for such allocation: 1) a straight line method allocated evenly throughout the four quarters, under which method the Debtor was insolvent as of March 1, 1989, by $1.5 million; 2) a cost of sales method allocating the difference between the cost of sales for the prior fiscal year with the current year (a difference of 44%) to each quarter at a rate of 11% per quarter, under which method the Debtor was insolvent as of March 1, 1989, by $3.2 million; and 3) a sales method which allocated the adjustments pro-rata relative to sales levels, under which method the Debtor was insolvent as of March 1, 1989, by $7.7 million.

Mr. Marston testified that he reviewed the SEC 10–Q Forms filed by the Debtor going back as far as 1984, and that in his opinion, the Debtor had a history of reporting inventory adjustments in the fourth quarter. In Mr. Marston's opinion, this demonstrated a trend that the Debtor was unable to properly estimate inventory throughout the course of the year until it took the physical inventory at the end of the year. The SEC 10–Q forms also revealed that sales in the quarter ended November 30, 1988, were $9.3 million; for quarter ended February 28, 1989, $6.2 million; for quarter ended May 31, 1989, $3.7 million; and for quarter ending September 1, 1989, $2.4 million.

Arrow's expert witness, Mr. Schwartz, analyzed Mr. Marston's declaration and deposi-

---

**13.** September 1, 1989, is date of the Debtor's audited report covering the consolidated balance sheets as of September 2, 1988, and September 1, 1989, which report was prepared by the Debtor's Certified Public Accountant, on November 29,1989.

tion and all exhibits, Mr. Marston's letter report, the Trustee's declaration and deposition transcript and all exhibits thereto, the auditor's report, and at least some of the SEC filings. Mr. Schwartz criticized Mr. Marston's failure to review monthly balance sheets and all documentation supporting them, which Mr. Schwartz believed was required under Generally Accepted Accounting Principles ("GAAP"). Mr. Schwartz further criticized Mr. Marston's allocation of the inventory write-downs without having obtained the actual accountant's working papers which would have described the physical inventory. Mr. Schwartz testified that there "must be a presumption" that the quarterly 10–Q Forms were prepared in accordance with GAAP. Mr. Schwartz termed Mr. Marston's allocation methods "imaginative," stating that accounting practices require loss to be recognized in the period that it occurs. Mr. Schwartz further opined that Mr. Marston's conclusions were based on speculation and not supported by any facts or accepted accounting principles. In Mr. Schwartz' opinion, it was "impossible" to determine when the Debtor became insolvent.

■ This Panel has held that there is no generally accepted accounting principle method for analyzing the insolvency of a company. *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (9th Cir. BAP 1989). Although such principles are relevant, they are not controlling in insolvency determinations. *Id.* Although Mr. Marston used unconventional methods to allocate the audit adjustments over the entire fiscal year, his analysis was based on the auditor's report, which report was never called into question. Additionally, Mr. Marston utilized three different methods to allocate the audit adjustments, each of which indicated that the Debtor was insolvent as of March 30, 1989, and at all times

thereafter. In contrast, Arrow's expert, Mr. Schwartz, offered no method for allocation whatsoever, and admitted that he had no reason to believe that the $19 million loss suffered by the Debtor in its last fiscal year was not incurred throughout the year.

The record is replete with evidence that the Debtor's financial records were lost or destroyed prior to the appointment of the Trustee, and that Mr. Marston used all of the data which was available to him. The Trustee should not be penalized for the fact that the Debtor's internal records were scant. The use of unconventional accounting methods to ascertain when insolvency occurred is not speculation. To the contrary, Mr. Marston allocated the inventory audit adjustment figures supplied to him by the auditor based upon his professional opinion that this Debtor had a history of overstating its inventory on the SEC reports due to reporting inventory adjustments only in the fourth quarter of each fiscal year.[14] In view of this testimony, had the bankruptcy court applied the entire $19 million adjustment to the final quarter, which even Arrow's expert did not suggest, it would have been speculating that the entire loss occurred in the final quarter.

■ Arrow's other arguments are equally unpersuasive.[15] The bankruptcy court has broad discretion when considering evidence to support a finding of insolvency. *Roblin*, 78 F.3d at 35. Mr. Marston's testimony was only part of the information relied on by the bankruptcy court in concluding that the trustee had met his burden of showing insolvency. Other factors considered were three years of substantial losses in 1987, 1988 and 1989, as reflected in the auditor's report, and the "precipitous drop" in sales in fiscal year 1989, reflecting a steady evaporation of demand for the Debtor's products. The bankruptcy court stated, "The apparent obsolescence of the [Debtor's] product supports Mr. Marston's analysis that the inventory audit

14. The historic documentation here distinguishes this case from *Chaitman v. Paisano Automotive Liquids, Inc. (In re Almarc Mfg., Inc.)*, 60 B.R. 584, 586 (Bankr.N.D.Ill.1986), wherein the accountant's statement that receivables and inventory were "overstated substantially" was insufficient to prove insolvency.

15. Mr. Marston testified that the Debtor had a history of overstating inventory on the SEC re-

ports due to reporting inventory adjustments only in the fourth quarter of each fiscal year. Mr. Schwartz made no criticism of Mr. Marston's use of the 10–Q Forms and made no suggestion that the SEC reports should be used to demonstrate that the Debtor was solvent. There was thus no clear error in the bankruptcy court's refusal to accept the SEC reports as evidence of the debtor's solvency.

adjustment should be allocated over the entire fiscal year." The bankruptcy court's acceptance of this method of allocation resulting in the finding of the Debtor's insolvency as of March 30, 1989, was not clearly erroneous.

## V. CONCLUSION

Although the bankruptcy court committed clear error in failing to make a factual inquiry as to whether the transfers made under the promissory note were in the ordinary course of business, the evidence supports the conclusion that the payments made under the note were extraordinary, outside of the parties' ordinary course of business and outside of prevailing industry standards. There being no genuine issue of material fact, partial summary judgment in favor of the Trustee was not in error. There was no abuse of discretion in granting the Trustee's motion for reconsideration. Furthermore, the bankruptcy court did not err in finding that the Debtor was insolvent at the time of the transfers at issue. Accordingly, the Panel **AFFIRMS** the bankruptcy court's judgment in favor of the Trustee and against Arrow in the amount of $58,645.02, plus interest from the date the complaint was filed.