In re WEILERT R.V., INC., Debtor.

Karl T. Anderson, Trustee, Plaintiff,

v.

Ganis Credit Corp., Defendant.

Karl T. Anderson, Trustee, Plaintiff,

v.

Bank of the West, Defendant.

Bankruptcy No. RS97–16032 MG.
Adversary Nos. RS98–1824
MG, RS98–1826 MG.

United States Bankruptcy Court,
C.D. California,
Riverside Division.

Feb. 25, 2000.

Steven E. Smith, Michael C. Abel, Danning, Gill, Diamond & Kollitz, Los Angeles, CA, for plaintiff-trustee in both adversary action.

Karl T. Anderson, Trustee, Palm Springs, CA, for trustee.

Dave M. McGraw, Gregg A. Eichler, Patrick K. McClellan, Law Offices of Dave M. McGraw, Walnut Creek, CA, for defendant—Bank of the West in adversary action RS98–1826 MG.

John A. Hendry, Hendry & Serian, South Pasadena, CA, for defendant—Ganis Credit Corporation in adversary action RS98–1824 MG.

## AMENDED OPINION, FINDINGS, CONCLUSIONS & ORDER RE GANIS CREDIT CORPORATION and BANK OF THE WEST

MITCHEL R. GOLDBERG, Bankruptcy Judge.

### INTRODUCTION

#### Procedural Background

On April 4, 1997, Weilert R.V., Inc. ("Debtor") filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101–1330. The Court appointed Karl T. Anderson ("Plaintiff") as Chapter 11 Trustee on April 24, 1997. On September 10, 1997 the case was converted to Chapter 7. Plaintiff commenced two separate adversary actions on December 23, 1998. The first, case number RS98–1824 MG, was brought against Ganis Credit Corporation; the second, case number RS98–1826 MG, was brought against Bank of the West (Ganis and Bank of the West, hereinafter collectively referred to as "Defendants").[1] These adversary actions were instituted against Defendants to determine whether the payments made by Debtor to Defendants during the ninety days prior to filing bankruptcy could be avoided as a preferential payment under Section 547(b).

On March 23, 1999, the Court jointly heard Plaintiffs motions for summary judgment against both Defendants. Plaintiffs were granted partial summary adjudication in each case as to all elements under Section 547(b). The remaining issue to be decided at trial was whether Defendants could prevail under the ordinary course defense provided by 11 U.S.C. § 547(c)(2). On July 9, 1999, the trial commenced, evidence was taken, and arguments were heard.

---

1. This Court acknowledges that separate evidence was presented by both Ganis and Bank of the West. However, because the facts of these two cases are so similar and the Defendants are lenders in the vehicle trade industry, the Court takes judicial notice of the evidence presented by both Defendants and, for purposes of this Opinion only, weighs the cumulative effect of all the evidence presented in order to address whether the Section 11 U.S.C. § 547(c)(2)(C) objective standard was met in either case. The Court considered all of the evidence and testimony presented in both cases in rendering this opinion.

## Factual Background

Debtor sold new and used recreational vehicles ("R.V.s"). The used vehicles were often obtained when the purchaser of a new R.V. had an older one to be used as a trade-in or a used vehicle was brought in to be sold on consignment ("trade-ins"). The trade-ins were sold by the Debtor as used vehicles. Often, money was still owed to the original financiers who held security interests in the used R.V.s. These liens were to be paid out of the money received by Debtor when the vehicle was traded in or when the used R.V.s were purchased by third parties.

Defendants were one of these "original financiers" and held security interests in used R.V.s sold by Debtor. In the ninety days prior to bankruptcy filing, Debtor made two payments to Ganis totaling $48,-304.59, and three payments to Bank of the West totaling $100,261.50.[2]

### Re: Ganis Trade–Ins

The first Ganis-secured R.V. was originally registered to Wilson and transferred to Debtor on November 21, 1996. Debtor resold the Wilson vehicle on January 30, 1997 to Pamplin, who took possession of the vehicle on or about that same date. Debtor received $37,005.33 as proceeds from its sale of the Wilson vehicle on January 30, 1997, and deposited those proceeds into its general account. Debtor then issued a check to Ganis. On February 20, 1997, the check issued to Ganis cleared Debtor's account. The time lapse from Debtor's receipt of the sale proceeds and transfer of the vehicle to Pamplin to the time the check cleared Debtor's account was 21 days. The time from trade-in to payoff was 91 days.

Another Ganis-secured R.V. was originally registered to Springer and transferred to Debtor on January 27, 1997. Debtor resold the Springer vehicle on February 6, 1997 to Taber, who took posses-sion of the vehicle on or about that same date. Debtor received $11,299.26 as proceeds from its sale of the Springer vehicle on February 6, 1997, and deposited those proceeds into its general account. Debtor then issued a check to Ganis. On March 19, 1997 the check issued to Ganis cleared Debtor's account. The time lapse from Debtor's receipt of the sale proceeds and transfer of the vehicle to Taber to the time the check cleared Debtor's account was 41 days. The time from the trade-in to payoff was 51 days.

When the Debtor's payoff checks to Ganis cleared, Ganis released its liens against the Wilson and Springer vehicles. Ganis was deemed to have held perfected security interests in both vehicles at the time of their payoffs.

### Re: Bank of the West Trade-ins

The first Bank of the West-secured R.V. was originally registered to Deeds and transferred to Debtor pursuant to a con-signment contract on October 4, 1996. Debtor resold the Deeds vehicle on No-vember 19, 1996 to Krum, who took pos-session of the vehicle on or about that date. Debtor received $44,272.71 as pro-ceeds from its sale of the Deeds vehicle and deposited those proceeds into its gen-eral account. On January 8, 1997, Debtor issued a check to Bank of the West and that check cleared on January 14, 1997. The time lapse from Debtor's receipt of the sale proceeds and transfer of the vehi-cle to Krum to the time the check cleared Debtor's account was 56 days. The time lapse from consignment of the vehicle to payoff was 102 days.

Bank of the West was deemed to have held a perfected security interest in the Deeds–Krum vehicle at the time of its payoff. As with Ganis, when Debtor's pay-off check to Bank of the West cleared, Bank of the West released its lien against the vehicle.

---

**2.** The Court notes that Bank of the West was the financier/lender for three vehicles, but one was a new vehicle.

The second Bank of the West transaction was a new vehicle sold on December 31, 1996 to Jones, who took possession on or about that date. · From the testimony received it appeared that Bank of the West issued a check to Debtor, and that check cleared on January 6, 1997. Subsequently, Bank of the· West issued a funding credit to Debtor's Bank of the West account in the amount of $42,280.79. On or about January 7, 1997, Bank of the West became aware of the error and instructed Debtor to refund the double payment. On January 10, 1997 Debtor issued a $42,280.79 check to Bank of the West and that check cleared on January 15, 1997. It is undisputed that these monies represented a refund to Bank of the West for an error that occurred. The time lapse from Debtor's receipt of the sale proceeds to the time the check cleared Debtor's account was not greater than 12 days, and only 9 days from the date funds cleared to Weilert to the date the funds cleared to Bank of the West.

The only issue before this Court is to determine whether Defendants' actions fall under the ordinary course of business defense of 11 U.S.C. § 547(c)(2).[3]

## DISCUSSION

Because the above proceedings "aris[e] in or [are] related to" a case under Title 11 of the United States Code, this Court maintains original jurisdiction over these adversary proceedings pursuant to 28 U.S.C. § 1334 (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157 (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges in the district), and General Order No. 266 dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). These matters are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(F) and (H), and this Court has authority to enter final orders in respect thereto. *See* 28 U.S.C. § 157(b)(1).

### Legal and Statutory Background

"Law can be stranger than fiction in the Preference Zone." *Committee of Creditors Holding Unsecured Claims v. Koch Oil Co. (In re Powerine Oil Co.)*, 59 F.3d 969, 971 (9th Cir.1995), *cert. denied* 516 U.S. 1140, 116 S.Ct. 973, 133 L.Ed.2d 893 (1996) (observing that an unsecured creditor can be better off when the debtor defaults rather than paying off its debt). Judge Kozinski's keen observation certainly rings true in the aftermath of Weilert R.V., Inc.'s financial deterioration. Had the payoffs not occurred, both Defendants would have retained their secured rights in their vehicles and their *in personam* rights to their borrowers. With acceptance of these funds and release of liens during the preference period, these lenders, who no longer had a legal interest in the units at that time, find themselves in this precarious position. This Court must consider whether the ordinary course of business exception is elastic enough to encompass the payments/vehicle title transactions between Debtor and Ganis, and Debtor and Bank of the West. This Court finds that

---

**3.** There was a third Bank of the West transaction presented to the Court. From notations in the Weilert records, the transaction euphemistically has been known as the "Richardson–Hubbard" matter. From the testimony received, the Court ruled on the record that the Bank of the West account was overdrawn in early March 1999 in the sum of $7,044.00. A deposit of $13,708.00 from the "Richardson–Hubbard" matter into the Bank of the West account brought the account from a negative $7,044.00 to a positive $6,663.00 as of the date of the bankruptcy filing. The positive balance was removed from the account post petition by Weilert. The Court concluded that the only preferential payment received by Bank of the West was the amount of $7,044.00. This Court concluded that these events did not fall within the ordinary course of business defense and ruled that Bank of the West had to repay $7,044.00 to the estate. Because this event is not dealt with in this opinion, and because of the specific ruling on the record, this transaction is only noted to complete the testimony and is not a part of this opinion.

the exception has some elasticity, but that the evidentiary burden upon the Defendants has not been properly met.

### 1. The Subjective and Objective Tests Under § 547(c)(2) Defined

The ordinary course of business exception is governed by 11 U.S.C. § 547(c)(2). The elements of a defense under 11 U.S.C. § 547(c)(2) are threefold. That is, the Trustee is prevented from avoiding a transfer where the transfer was:

(A) in payment of a debt incurred by debtor in the ordinary course of business or financial affairs of the debtor and the transferee; [4]

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

 The Section 547(c) exception to preference avoidance was meant to protect ordinary trade transactions, as well as transactions that arise in the context of a debtor's financial distress. *See Air One, Inc. v. Flight Support International, Inc. (In re Air One, Inc.)* 80 B.R. 145–147 (Bankr.E.D.Mo.1987); *Tidwell v. Atlanta Gas Light Co. (In Matter of Georgia Steel, Inc.)*, 38 B.R. 829 (Bankr.M.D.Ga.1984). To determine whether a transaction is made in the ordinary course, courts examine whether the parties themselves would consider the transaction ordinary, an inquiry which is often referred to as the subjective standard—the Section 547(c)(2)(B) test. Courts also examine whether the payment was made according to ordinary business terms, a test commonly referred to as the objective standard—the Section 547(c)(2)(C) test. This Court finds that Defendants met the burden on the subjective standard. As such, the focus now is to determine whether Defendants have met their burden under the objective standard, i.e., under Section 547(c)(2)(C).

### 2. The Objective Standard Explored

 The objective standard looks to whether the relevant industry would consider payment to have been made according to "ordinary business terms." As courts recognize, "[t]he 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate." *In re Magic Circle Energy Corp.*, 64 B.R. 269, 275 (Bankr.W.D.Okla. 1986) citing *Committee of Asbestos–Related Litigants and/or Creditors v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 60 B.R. 612, 617 (Bankr.S.D.N.Y. 1986). The objective standard of Section 547(c)(2)(C) is a highly fact-intensive inquiry and a frustrating exercise with which courts have often struggled. *See McCord v. Venus Foods, Inc. (In re Lan Yik Foods Corp.)*, 185 B.R. 103, 110 (Bankr.E.D.N.Y. 1995) (noting the absence of a precise legal test); Lawrence Ponoroff & Julie C. Ashby, *Desperate Times and Desperate Measured: The Troubled State Of The Ordinary Course of Business Defense—And What To Do About It*, 72 Wash.L.Rev. 5 (1997); *Lawson v. Ford Motor Co. (In re Roblin Industries)*, 78 F.3d 30, 39–40 (2d Cir.1996).

The struggle that courts are often faced with is the lack of sufficient evidence of an industry standard. This lack of sufficient evidence, Defendants argue, is based on the difficulty defendants have in obtaining evidence of any industry standard due to the competitive nature of an industry. This is particularly true in the vehicle retailing industry where the practice of "playing the float" is not a practice that dealers would like to admit to, nor do lenders want to admit to the apparent lack of a set procedure for contacting dealers regarding the status of vehicle sales. Such is the case before this Court.

---

4. Plaintiff has stipulated to Section (c)(2)(A).

The most persuasive testimony provided was the testimony of David G. Russell, witness for Defendant Bank of the West. Mr. Russell testified to having once owned a dealership, but was currently a vice-president with Bank of the West and their western regional sales manager. Mr. Russell further testified that he was familiar with the practices of R.V. dealers with respect to lien payoffs on both consignment and trade-in vehicles. The Court finds Mr. Russell's testimony instructive and noteworthy.

According to Mr. Russell, with consignments, the dealer has the customer sign an agreement which basically states that upon sale the dealer will pay the customer a sum certain. Pursuant to DMV regulations, the dealer has 20 days to make a payment to that customer from the date of the sale. However, the payoff time may be re-negotiated with the customer to the extent necessary. Additionally, dealers do not get the registration and signed certificate of ownership from the customer, or ask the customer to sign a power of attorney for the DMV until the sale is completed. Finally, dealers obtain a written authorization for payoff from the original owner of a vehicle. This authorization for payoff is obtained when the sale is made.

With trade-in vehicles, however, the dealer is given the registration and a signed transfer of certificate of ownership along with the authorization for payoff and power of attorney, which are held by the dealer from the point the customer delivers the trade-in vehicle to the dealer which enables the dealer to obtain title. On the contrary, with consignment scenarios, the dealer does not actually obtain title, except for a few minutes while the paperwork changes hands.

Mr. Russell indicated that there is a unique difference between consignment and trade-ins that may impact whether an original financier of a vehicle will be notified that a vehicle is on the dealer's lot. The customer in a consignment deal will call a dealer frequently to check on the status of a sale. This is done because the dealer requires the customer to maintain monthly payments and insurance on the vehicle. Dealers will typically only contact a lender at the time of the sale to a new customer. This contact is made in order to verify the payoff amount (assuming the consignment vehicle had a lien against it).

A trade-in customer, on the other hand, is not required to maintain monthly payments and insurance. Therefore, the trade-in customer will not call the dealer unless the customer's next payment comes due, and is not paid (i.e., the trade-in customer will only call to ask why the dealer has not yet paid the lender). However, implicit in this call from the customer is acknowledgement that the lender has been made aware that the vehicle has been traded in to the dealer. As with consignments, however, the lender of a trade-in would only be contacted by the dealer at the time of sale to a new customer for purposes of pay-off verification.

Whether dealing with a consignment or trade-in transaction, a lender only contacts the dealer if the original customer defaults on payment. The lender would then inquire as to the dealer's estimate of the vehicle's worth and request a time estimate needed to sell the vehicle. According to Mr. Russell's testimony, a lender would not come on the lot and pick up the unit because of non-payment by the customer. Lenders generally do not want to take a vehicle back. In the consignment scenario, a lender may wait many months. However, Mr. Russell testified that, in his general experience, lenders did not wait many months for the payoff, because the dealers would eventually sell the trade-in or floor the consigned vehicles and get the money to pay them off.

According to the trial testimony, dealers will wait as long as possible to make a lien payoff to the lender. With consignments, new financing agreements may be entered into. Once the monies from the new financing are received, a dealer then has 20

days to pay the lenders any balance owed and give the original obligors the differential. Dealers want to make certain the money has cleared and there is no cancellation of sale. Moreover, Mr. Russell explained the time period it took to pay a unit off would vary in each case. However, the bottom line was that if a dealer had the money in its account, the vehicle would be paid off quickly; if a dealer did not have the funds, the lender would not get paid until the dealer's account was replenished.

On trade-ins, however, the time it takes to pay off a lienholder from the time the trade-in vehicle was sold to a third party, may take from one to 45 days. Mr. Russell testified that the average, or mean time, was probably 20 days (as is the case with consignments). The timing of a payment to a lienholder also depends upon the condition of the vehicle. If the trade-in was a bad unit, then the dealer would likely pay off the lender promptly because the dealer was going to wholesale the unit to a wholesaler. On the other hand, if the unit was a good product, then the dealer would delay paying it off until it either had the money or until the lender contacted the dealer due to a defaulting customer. In the latter scenario, the time could easily be extended beyond 45 days from the date of trade-in.

Mr. Russell added that, ultimately, the time it takes to pay off a lender will vary greatly because much depends upon the level of trust that is built up between a lender and a dealer. This level of trust is necessary in order for lenders and dealers to do business. Technically, this is because every sale that is made is an out-of-trust situation (i.e., dealer has the cash but no longer has the vehicle, and has not yet paid the lender).

Recognizing that the foregoing, while extensive, was virtually the only testimony taken to evidence an industry standard, Defendants point to both California statutory law and case law to bolster their position that substantial evidence of industry practice is not required. Defendants argue that their dealings with Debtor were within ordinary industry practice because the vehicle trade industry is governed, in part, by California Vehicle Code Section 5600. This section pertains to vehicle transfer requirements and states:

No transfer of the title or any interest in or to a vehicle registered under this code shall pass, and any attempted transfer shall not be effective, until the parties thereto have fulfilled either of the following requirements:

(a) The transferor has made proper endorsement and delivery of the certificate of ownership to the transferee as provided in this code and the transferee has delivered to the department or has placed the certificate in the United States mail addressed to the department when and as required under this code with the proper transfer fee, together with the amount required to be paid under Part 1 (commending with Section 6001), Division 2 of the Revenue and Taxation Code wit respect to the use by the transferee of the vehicle, and thereby makes application for a transfer of registration except as otherwise provided in Sections 5905, 5906, 5907 and 5908.

(b) The transferor has delivered to the department or has placed in the United States mail addressed to the department the appropriate documents for the registration or transfer of registration of the vehicle pursuant to the sale or transfer except as provided in Section 5602.

Here it was established at hearing that it is customary for the lending company to deliver the certificate of title for a vehicle only upon receipt of funds. Moreover, this practice is required by operation of law under California Vehicle Code § 5600. In light of the California Vehicle Code, Defendants conclude that no evidence, or at least very little evidence, of industry-wide practice regarding vehicle trade-ins would be warranted as Defendants did not come to the table as free agents, asking to deal with Debtor. For the most part, third

parties brought Defendants to the Debtor's table and into Debtor's disastrous financial morass. Under the California Vehicle Code, state law required Defendants to sign over lien documents to Debtor upon payoff and, since they acted under the California Vehicle Code, no other evidence regarding lapse of time prior to the payoff, or location of security at payoff, was needed.

This Court does not dispute that delivery of the certificate of title for a vehicle upon receipt of funds was the ordinary practice within the industry. Indeed, the practice was mandated by statute. However, the statute is silent as to what constitutes ordinary practice of the industry during the period of time between receipt of proceeds by the Debtor from a third-party purchaser and the transfer of those proceeds to the Defendant. This is important because at the time that Debtor paid proceeds to the lender, Debtor no longer had an interest in the vehicles, and only had a duty to his two customers, i.e., the one who traded in and the one who purchased the used vehicle.

Although very little case law exists with respect to the vehicle dealership industry and the subordination of various parties' rights within that specific industry, this Court recognizes a Ninth Circuit Bankruptcy Appellate Panel ("BAP") case, *General Motors Acceptance Corporation v. Rodgers (In re Laguna Beach Motors)*, 148 B.R. 317 (9th Cir. BAP 1992).

The facts of the *Laguna* case are foursquare on point to the facts of this case. In that case, GMAC held a perfected security interest, pursuant to the California Motor Vehicle Code Section 5600, in an automobile owned by an individual ("Hasty"). Hasty entered into an agreement with a used car dealer, Laguna Beach Motors ("Laguna"), to sell his vehicle. Hasty gave Laguna possession of the vehicle in order to facilitate its sale. Hasty and Laguna had entered into an option agreement under which Laguna could acquire title to the vehicle only if it paid off GMAC's lien. Laguna sold the Hasty vehicle to a third-party purchaser and purported to transfer title to that purchaser. However, it did so without first satisfying the GMAC lien or without providing valid title to the third-party purchaser. After a demand by Hasty, Laguna finally paid off the GMAC lien during the preference period. GMAC then released its lien in order to effectuate a transfer of title on the vehicle. The Chapter 7 Trustee commenced an adversary proceeding against GMAC arguing that it had received a preferential transfer. The trial court ruled in favor of the Trustee. The BAP reversed. The BAP reasoned that it would be "inequitable to hold that GMAC, relying on its rights under the California Motor Vehicle Code, and an utter stranger to the debtor, is in the same position as a preferential transferee." *Id.* at 321.[5]

■ The Court recognizes that the *Laguna* discussion occurs in a different context—the "new value" defense under 11 U.S.C. § 547(c)(1). If the statutory mandate of the Section 547(c)(2)(C) defense was not clear, i.e., requiring defendants to present evidence of industry practice, this Court would be compelled, or could choose, to adopt the *Laguna* discussion as its guiding force. However, as Judge Kozinski observed in his later-decided case on the "new value" defense, "[e]quity may not be invoked to defeat clear statutory language, nor to reach results inconsistent with the statutory scheme established by the Bankruptcy Code." *In re Powerine Oil Co.*, 59 F.3d at 971. The Ninth Circuit's reasoning in *Powerine* disallows the equity principles set forth in *Laguna* to be adopted.

The majority of circuits have recognized the difficulty defendants and courts are faced with and have tended to view the

---

5. This Court also is aware of another case involving Laguna Motors that reached a contrary result to the Laguna Motors case discussed *infra*. *See Rodgers v. Schneider (In re Laguna Beach Motors, Inc.)*, 148 B.R. 322 (9th Cir. BAP 1992). In that case, the BAP held that an owner's execution of a vehicle's title certificate *did not* constitute contemporaneous exchange for new value and, thus, the transfer was deemed a preference.

objective industry standard broadly. *See In the Matter of Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir.1993) (acknowledging difficulty defendants may encounter in attempting to gather information, but nonetheless concluding that some evidence must be presented to establish industry-wide standards); *Jones v. United Savings & Loan Association (In re U.S.A. Inns)*, 9 F.3d 680 (8th Cir.1993) (recognizing that changes in industry practice to accommodate troubled debtors—i.e., adjustments or restructuring of payment terms—could fall within the ordinary course exception); *In re Roblin Industries*, 78 F.3d at 40 (2d Cir.1996) (recognizing that a restructured payment on a defaulted debt can be considered ordinary and stating: "Restricting a creditor to courses of action typical in untroubled times leaves no room for realistic debt workouts and unfairly penalizes those creditors that take conventional steps to institute a repayment plan."); *But see Clark v. Balcor Real Estate Finance, Inc. (In re Meridith Hoffman Partners)* 12 F.3d 1549, 1553 (10th Cir.1993) (adopting a more narrow application of the ordinary course exception by limiting examination of industry standard as used in "ordinary circumstances, when debtors are healthy").[6]

■ Indeed, cases since *Tolona* have interpreted "ordinary business terms" to encompass a gamut of practices in which similar firms engage. *See In re DeMert & Dougherty, Inc.*, 232 B.R. 103, 109 *citing USA Inns of Eureka Springs, Ark. Inc.*, 9 F.3d 680, 685 (8th Cir.1993); *see also Schwinn Plan Committee v. AFS Cycle Co.*, 205 B.R. 557, 573 (Bankr.N.D.Ill.1997). The Fourth Circuit went so far as to explicitly adopt a "sliding scale" approach to the determination of an industry standard. *See Advo–System, Inc. v. Maxway Corp.*, 37 F.3d 1044, 1050 (4th Cir.1994). This "sliding scale approach invites a subjective element to the application of Section

547(c)(2)(C)". See *Ponoroff* and *Ashby*, *supra*. Not only do the economic realities of a failing business require a broad application of the objective standard, but such an approach coincides with the legislative intent behind the preference code provisions.

■ The judicial response of broadening the definition of the objective test should come as no surprise. Congress drafted 11 U.S.C. § 547(c) in recognition of the need for exceptions to the avoidance of a preference transfer. The legislative history tells us simply that the purpose of this exception is "to leave undisturbed **normal** financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." S.Rep. No. 95–989 at 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874; H.R.Rep. No. 95–595 at 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329. (Emphasis added). It logically follows that the ordinary course of business standard should be elastic enough to be meaningfully applied to the unique demands and circumstances of different industries. To do otherwise would render the spirit of the preference exception hollow.

■ While the majority of cases permit this Court to take a broad look at the vehicle industry standard and permit considering courses of action taken in troubled times, the often-cited *Tolona Pizza* case makes clear that however broad an interpretation is applied, some proof of an industry standard is warranted. *Tolona Pizza*, 3 F.3d at 1033; *accord Cocolat, Inc. v. Fisher Development, Inc. (In re Cocolat, Inc.)*, 176 B.R. 540, 550 (Bankr.N.D.Cal. 1995). In *Tolona Pizza*, Tolona, a pizza maker, issued eight checks within 90 days prior to filing bankruptcy totaling approximately $46,000 to Rose, its sausage supplier. *Tolona Pizza*, 3 F.3d at 1031. The

---

**6.** Only one Ninth Circuit BAP case touches on this specific issue. *Bell Flavors & Fragrances, Inc. v. Andrew (In re Loretto Winery, Ltd.)*, 107 B.R. 707, 709 (9th Cir. BAP 1989). The Lor-

etto court, however, does not delve greatly into defining the nature of the industry standard, but comments on the need for objective evidence of the relevant industry.

checks paid off the Rose debt in full. Tolona, as debtor-in-possession, sought to recover the eight payments as voidable preferences. The bankruptcy court entered judgment in favor of Tolona. The district court reversed, ruling that "Rose did not, in order to comply with section 547(c)(2)(C), have to prove that the terms on which it had extended credit to Tolona were standard terms in the industry, but that if this was in [error] the testimony of Rose's executive vice-president, ..., did prove it." *Id.* On appeal the 7th Circuit, without addressing whether the district court judge had applied an incorrect standard of review, held that " 'ordinary business terms' refers to the range of terms that encompass the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C." *Id.* at 1033. The 7th Circuit recognized that Rose's executive vice-president's testimony revealed that Rose and its competitors paid little attention to the payment terms stated on the invoices, and concluded that "[t]here is no single set of terms on which the members of [this] industry have coalesced; instead there is a broad range and the district judge plausibly situated the dealings between Rose and Tolona within it." *Id.*

The premise of *Tolona Pizza* and its progeny should be considered when evaluating the receipt of late payments as within normal industry practice. *Tolona Pizza* is instructive in this case because the erratic billing practices in the pizza industry are not unlike the erratic billing practices found in the R.V. dealership industry. While *Tolona Pizza* makes clear that a creditor must show that payments received were in the ordinary business terms of the industry, a creditor need not show "the existence of some single uniform set of business terms." *Id.* at 1033. The 7th Circuit stated that "while it is plain that neither Rose nor its competitors enforce payment within seven days, it is unclear that there is a standard outer limit of forbearance. It would seem that 21 days is a goal, but that payment as late as 30 days is generally tolerated and that for good customers even longer delays are allowed." *Id.* The 7th Circuit determined that "[t]he average period between Rose's invoice and Tolona's payment during the preference period was only 22 days," which was well within the industry norm. *Id.*

In the case at hand, the testimony of Mr. Russell revealed that while lenders were normally paid off in 20 days from receipt of proceeds from sale, it was not uncommon that payoff periods could easily be extended beyond 45 days particularly with trade-in vehicles. Indeed, Mr. Russell stated that the time taken to pay a lender varied—it depended on a variety of factors, with the level of trust built up between the lender and dealer being key. With the exception of the payoff of the new vehicle to Defendant Bank of the West, Defendants were paid off anywhere from day 21 to day 56. Defendants would have this Court conclude that the testimony of Mr. Russell, vice president to Bank of the West, sufficiently established an industry standard for the R.V. industry; namely, that there exists a minimum allowable payoff period of up to 20 days, but no clear standard outer limit. This Court is not prepared to arrive at such a conclusion.

While this Court understands that once the Defendants accepted monies from Debtor they had no choice but to turn over title, this Court also recognizes that Defendants had choices prior to receiving those monies—which was not the case with the sausage supplier, Rose, in the *Tolona Pizza* case. The only options Rose had was to terminate business, require C.O.D., or continue with its practice, which was to submit an invoice to Tolona and wait 20–plus days for payment. Here, this Court recognizes the uniqueness of this industry in that a lender may not be aware that a particular dealer is holding an R.V. vehicle to which it has a security interest, or is holding proceeds from the sale of that R.V. vehicle until after the period of time a payment that comes due remained unpaid.

At trial, Mr. Russell testified when a payment was late, either the original owner of the vehicle would inform the lender that the vehicle was traded in, or the lenders would call the original owner to inquire about the late payment. A lender would typically inquire 15 days after the due date so that the maximum number of days from trade in to inquiry would be 45 days. Once a lender knew the vehicle was on a dealer's lot, the lender would typically call the dealer to inquire as to dealer's estimate of vehicle's worth and the estimate of the time period needed to sell. However, after this inquiry, no further action was taken. Despite the passage of time, neither of the Defendants engaged in any further inquiry after being placed on notice that the vehicle was in the dealer's possession. This is unfortunate, since it is the conduct of the lender, after this 45–day period, when inquiry notice arises, and a check is later received that must be the focus of attention to the "ordinary business practices."

█ In a bankruptcy setting when these vehicle trade-in and consignment cases arise, lenders must first show they had followed a reasonable inquiry notice. For example, where a vehicle had been on the lot for some time, Defendants should also require proof of when the vehicle was sold, as well as when funds are tendered, i.e., more than receipt of a check should be required. Had Defendants engaged in further inquiry, they could have then required that the payment be issued as a two-party check to the borrower and lender. The borrower could endorse the check and then forward it to the lender. If Defendants had taken such precautions, then the preference would not be with the lender, but solely with the borrower. Until Defendants completed the inquiry and accepted the funds, Defendants were not required—by operation of law—to release their liens and sign over the certificates of title. Therefore, to preserve their ordinary course of business defenses in a bankruptcy setting when debtor-dealers are starting their slide into bankruptcy, lenders in the vehicle industry must take minimal affirmative steps to inquire when payments are late. The evidence presented demonstrates that lenders make no more than a cursory inquiry once they have been apprised that a vehicle is no longer in possession of their borrower, but in possession of the dealer for resale. Apparently, because the lender industry knows its security lies with the vehicle, they generally do not care when the dealer pays them off. The only exception may arise if property insurance on the vehicle expires. In this instance lenders would want payoff to occur before expiration. However, in their "blissful" ignorance, lenders may not actually know when the property insurance expires, since they rely on the dealers' blanket policy for all vehicles on their lot. However, once the vehicle left the lot on a sale to a third party, who does not know of the lender's lien, the lender, in fact, is an uninsured party should the property be damaged during the "gap" between sale and payoff. Such conduct, while it may seem prudent in a non-bankruptcy context, does not meet the objective business standard required by the 11 U.S.C. § 547(c)(2) defense.

█ The Bank of the West's Jones transaction requires some discussion at this juncture. Defendant Bank of the West presented testimony by Ms. Pamela Norton, a vice-president and projects manager for Bank of the West. According to Ms. Norton's testimony, Bank of the West issued a check on January 3, 1997, and on January 7, 1997 authorized an automatic deposit into the Weilert account. Ms. Norton further testified that the inadvertent double disbursement to the Debtor was corrected by demanding a refund on or about January 7, 1997. Debtor then issued a check on January 10, 1997, which did not clear until January 15, 1997. The testimony further revealed that Ms. Norton was unaware of any other overpayment scenario with Debtor, but indicated that overpayment scenarios or errors in loan processing rarely occurred and account for less than 2% of the transactions.

It is clear that an error was made, and the testimony at trial indicated that the procedure in place was to demand an immediate repayment of an inadvertent double disbursement or overpayment. This Court finds that the time from Bank of the West's discovery of the error to the time Debtor's check cleared was sufficiently immediate to fall within the meaning of ordinary course under § 547(c)(2)(C).

### FINDINGS OF FACT and CONCLUSIONS OF LAW

■ Defendants had to be on notice after the first 45 days from trade-in (the next month's payment due date plus 15 days) that the vehicle was on Debtor's lot. So, until the next month's installment date, Defendants were under no duty to conduct inquiry regarding the status of their vehicles. Any action taken by Debtor and Defendants within that 45-day time period, therefore, would be considered "ordinary" and would not be subject to avoidance as a preference.

Beyond that time period, however, Defendants were on notice that their security was on dealer's lot and continued to remain unpaid. Therefore, Defendants must take some of the risk that they are dealing with an insolvent dealer. Defendants, and the vehicle trade industry, must take reasonable affirmative steps to preserve their security. Lenders are really afforded "two bites at the apple." They would meet the ordinary course standard if payoff is within 45 days of trade-in or, if payoff is within 20 days of receipt of funds from the third-party purchaser. Merely stating the industry practice is "to do nothing" and follow the vehicle code by release of lien only on payoff, is insufficient to warrant a judgment in favor of Defendants. Such a failure to act would render the Section 547(c)(2) ordinary course defense meaningless.[7]

As for the Bank of the West's Jones transaction, this Court finds that the testimony at trial described an industry procedure in dealing with errors in loan processing. Essentially, the procedure was to demand an immediate repayment of an inadvertent double disbursement or overpayment. This Court finds that the time from Bank of the West's discovery of the error to the time Debtor's check cleared was sufficiently immediate to fall within the meaning of ordinary course under § 547(c)(2)(C).

The foregoing Opinion constitutes this Courts Findings of fact and Conclusions of Law in their entirety.

---

**7.** The result reached in this case is disconcerting. Perhaps the only way to change this outcome is for the Legislature to require dealers to hold funds for lenders in blocked trust accounts, particularly on consignment cases. Until such a requirement, however, Defendants have a burden on trade-ins and consignments to be a little more diligent.