**In re JAN WEILERT R.V.,
INC., Debtor.**

Ganis Credit Corporation, Appellant,

v.

Karl T. Anderson, Chapter 7 Trustee,
Bank of the West, and U.S.
Trustee, Appellees.

BAP No. CC–00–1110–PBMo.
Bankruptcy No. RS 97–16032–MG.
Adversary No. RS 98–1824–MG.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted July 20, 2000.

Decided Jan. 24, 2001.

John A. Hendry, South Pasadena, CA, for Ganis Credit Corporation.

Michael C. Abel, Danning, Gill, Diamond & Kollitz, LLP, Los Angeles, CA, for Karl T. Anderson, trustee.

Before: MONTALI, PERRIS and BRANDT, Bankruptcy Judges.

MONTALI, Bankruptcy Judge.

Creditor Ganis Credit Corp. (Ganis) held liens on recreational vehicles (R.V.s) that had been traded in to debtor Jan Weilert R.V., Inc. (debtor), an R.V. dealer. The chapter 7[1] trustee sought to recover two payments debtor made to Ganis totaling $48,304.59 as preferential transfers under 547(b). The bankruptcy court rejected Ganis's ordinary course of business defense under § 547(c)(2) and entered judgment for the trustee.[2] The only issue on appeal is whether the bankruptcy court correctly applied the objective industry standard for the ordinary course of business defense. We AFFIRM.

### FACTS

The bankruptcy court succinctly stated the background facts:

Debtor sold new and used recreational vehicles ("R.V.s"). The used vehicles were often obtained when the purchaser of a new R.V. had an older one to be used as a trade-in or a used vehicle was brought in to be sold on consignment ("trade-ins"). The trade-ins were sold by the Debtor as used vehicles. Often, money was still owed to the original financiers who held security interests in the used R.V.s. These liens were to be paid out of the money received by Debtor when the vehicle was traded in or when the used R.V.s were purchased by third parties.

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

2. The court's published opinion covered two separate but related preference actions involving very similar facts: this adversary proceeding involving Ganis, and one involving Bank

Defendants were one of these "original financiers" and held security interests in used R.V.s sold by Debtor. In the ninety days prior to bankruptcy filing, Debtor made two payments to Ganis totaling $48,304.59 . . . .

*In re Weilert R.V., Inc.,* 245 B.R. 377, 380 (Bankr.C.D.Cal.2000).

The case before us involves those two payoffs of liens on trade-ins. The first trade-in R.V. was delivered to debtor by a customer on November 21, 1996. Debtor resold it on January 30, 1997, receiving $37,005.33 from the buyer the same day. Debtor deposited the proceeds in its general account. On February 20, 1997, twenty-one days later (and ninety-one days after trade-in), the check that debtor had issued to Ganis to pay off the lien cleared debtor's bank account. Thus debtor had unrestricted use of that money for that period of time, while Ganis's collateral had been turned over to the buyer, subject to the Ganis lien.

The second trade-in R.V. was received by debtor on January 27, 1997. Debtor resold it on February 6, 1997, for $11,299.26 and deposited the proceeds in its general account. The check debtor issued to Ganis to pay off the second R.V. cleared debtor's account on March 19, 1997, forty-one days later (and fifty-one days after trade-in). Again, debtor had use of the sales proceeds for that period of time while Ganis's collateral was out of its and debtor's control. In each case, when Ganis was paid, it released its lien on the respective R.V.

After debtor filed chapter 7, appellee, as trustee, brought an adversary proceeding to recover the two payments as preferences. All of the elements of a preference under § 547(b) were established on sum-

of the West. The order in the Bank of the West case is on appeal and cross-appeal to the District Court; those appeals remain pending. *In re Jan Weilert RV Inc.,* No. 00–CV–86 (C.D.Cal. filed February 15, 2000) and No. 00–CV–158 (C.D.Cal. filed March 16, 2000).

mary judgment, and the propriety of that decision is not before us. In granting summary adjudication in favor of appellee on the § 547(b) preference elements the court found as ordinary course of business, debtor's incurring obligations to pay off liens owed on trade-ins transferred to it by debtor's customers. It also found that part of debtor's ordinary course of business was to sell used R.V.s free and clear of any liens and that the payments were made in the ordinary course of business or financial affairs of debtor and Ganis (satisfying § 547(c)(2)(B)). In addition, a joint pretrial order established that the two payments to Ganis were "on account of an antecedent debt."

After the trials in this case and the related case involving Bank of the West, the court issued a single opinion setting out its findings and conclusions. The court took judicial notice of the evidence presented in both cases, and considered all of the evidence in both cases in rendering its decision in each case.[3] The court found that Ganis had not proven that the payments to it had been made according to ordinary business terms. Ganis appeals.

## ISSUE

As noted, we do not revisit the trustee's prima facie case under § 547(b). Our attention is limited to the only real issue at the trial, and the only issue on appeal, viz. whether Ganis had established that the payments to it were made according to ordinary business terms, as required for its ordinary course of business defense under § 547(c)(2)(C).

## STANDARD OF REVIEW

Determining whether the bankruptcy court applied the correct legal standard is a question of law that the panel reviews *de novo. See In re Loretto Winery, Ltd.,* 107 B.R. 707, 709 (9th Cir. BAP 1989). Whether a payment is made according to ordinary business terms is a question of fact reviewed for clear error. *In re Kaypro,* 230 B.R. 400, 403 (9th Cir. BAP 1999), *aff'd in part, rev'd in part,* 218 F.3d 1070 (9th Cir.2000). To the extent questions of fact cannot be separated from questions of law, the panel reviews them *de novo* as mixed questions of law and fact. *Id.* at 404.

## DISCUSSION

Section 547(b) provides that certain transfers made by the debtor within 90 days before bankruptcy may be avoided as "preferences."[4] A transferee of a preferential payment may prevent avoidance if

---

3. The court said:

This Court acknowledges that separate evidence was presented by both Ganis and Bank of the West. However, because the facts of these two cases are so similar and the Defendants are lenders in the vehicle trade industry, the Court takes judicial notice of the evidence presented by both Defendants and, for purposes of this Opinion only, weighs the cumulative effect of all the evidence presented in order to address whether the Section 11 U.S.C. § 547(c)(2)(C) objective standard was met in either case. The Court considered all of the evidence and testimony presented in both cases in rendering this opinion.

245 B.R. at 379 n. 1.

No party to this appeal has taken exception to this procedure, and we do not question it.

4. Section 547(b) provides:

[T]he trustee may avoid any transfer of an interest of the debtor in property—
(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

it can prove by a preponderance of the evidence that it satisfies the elements of one of the defenses to avoidance of preferential payments set out in § 547(c). § 547(g); *Kaypro,* 230 B.R. at 404. Section 547(c)(2) provides that the trustee may not avoid a transfer:

to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

The defense at issue in this case is the third and final element of ordinary course of business defense set out in § 547(c)(2).

### 1. *The Bankruptcy Court's Ruling*

In its published amended opinion addressing whether debtor's payments to Ganis met the requirement of § 547(c)(2)(C), that the transfers be made according to ordinary business terms, the bankruptcy court acknowledged application of an objective standard, which "looks to whether the relevant industry would consider payment to have been made according to 'ordinary business terms.'" *Weilert,* 245 B.R. at 382. Relying on testimony presented by David Russell, a witness for Bank of the West, the court found that the practice of R.V. dealers for trade-in vehicles was to pay off a lienholder on a trade-in vehicle within one to 45 days from the time the vehicle was sold to a third party, although payment could "easily be extended beyond 45 days from the date of trade-in." *Id.* at 384.

The court also noted that it was customary in the industry, and in fact required by state law, that the lienholder sign over the lien documents upon payoff. *Id.* at 385.

The court stated:

At trial, Mr. Russell testified when a payment [from the original owner to the lienholder] was late, either the original owner of the vehicle would inform the lender that the vehicle was traded in, or the lenders would call the original owner to inquire about the late payment. A lender would typically inquire 15 days after the due date so that the maximum number of days from trade in to inquiry would be 45 days. Once a lender knew the vehicle was on a dealer's lot, the lender would typically call the dealer to inquire as to dealer's estimate of vehicle's worth and the estimate of the time period needed to sell. However, after this inquiry, no further action was taken. Despite the passage of time, neither of the Defendants engaged in any further inquiry after being placed on notice that the vehicle was in the dealer's possession. This is unfortunate, since it is the conduct of the lender, after this 45–day period, when inquiry notice arises, and a check is later received that must be the focus of attention to the "ordinary business practices."

In a bankruptcy setting when these vehicle trade-in and consignment cases arise, lenders must first show they had followed a reasonable inquiry notice. For example, where a vehicle had been on the lot for some time, Defendants should also require proof of when the vehicle was sold, as well as when funds are tendered, i.e., more than receipt of a check should be required. Had Defendants engaged in further inquiry, they could have then required that the payment be issued as a two-party check to the borrower and lender. The borrower could endorse the check and then forward it to the lender. If Defendants had taken such precautions, then the preference would not be with the lender, but solely with the borrower. Until Defendants completed the inquiry and accepted the funds, Defendants were not required—by operation of law—to release their liens and sign over the certificates of title. Therefore, to preserve their ordinary course of business defens-

**6**

es in a bankruptcy setting when debtor-dealers are starting their slide into bankruptcy, lenders in the vehicle industry must take minimal affirmative steps to inquire when payments are late. The evidence presented demonstrates that lenders make no more than a cursory inquiry once they have been apprised that a vehicle is no longer in possession of their borrower, but in possession of the dealer for resale. Apparently, because the lender industry knows its security lies with the vehicle, they generally do not care when the dealer pays them off.... Such conduct, while it may seem prudent in a non-bankruptcy context, does not meet the objective business standard required by the 11 U.S.C. § 547(c)(2) defense.

*Id.* at 388. The court then captioned the following as Findings of Fact and Conclusions of Law:

Defendants had to be on notice after the first 45 days from trade-in (the next month's payment due date plus 15 days) that the vehicle was on Debtor's lot. So, until the next month's installment date, Defendants were under no duty to conduct inquiry regarding the status of their vehicles. Any action taken by Debtor and Defendants within that 45–day time period, therefore, would be considered "ordinary" and would not be subject to avoidance as a preference.

Beyond that time period, however, Defendants were on notice that their security was on dealer's lot and continued to remain unpaid. Therefore, Defendants must take some of the risk that they are dealing with an insolvent dealer. Defendants, and the vehicle trade industry, must take reasonable affirmative steps to preserve their security. Lenders are really afforded "two bites at the apple." *They would meet the ordinary course standard if payoff is within 45 days of trade-in or, if payoff is within 20 days of receipt of funds from the third-party purchaser.* Merely stating the industry practice is "to do

nothing" and follow the vehicle code by release of lien only on payoff, is insufficient to warrant a judgment in favor of Defendants. Such a failure to act would render the Section 547(c)(2) ordinary course defense meaningless.

*Id.* at 389 (footnote omitted) (emphasis added).

### 2. *Ordinary Business Terms*

Ganis argues that the court misapplied the legal standard for "ordinary business terms" in two ways, by adding a diligence standard and by focusing on the delay between the time a vehicle comes on debtor's lot as a trade-in and the time of payment, rather than the lack of delay between payoff and release of the lien.

■ The phrase "ordinary business terms" in § 547(c)(2)(C) is not defined in the Bankruptcy Code. The Ninth Circuit interprets it to mean that a creditor must show that the payment at issue was "ordinary in relation to prevailing business standards." *In re Food Catering & Housing, Inc.*, 971 F.2d 396, 398 (9th Cir.1992). In applying that standard, the court is to apply an objective standard, which requires proof of "practices common to businesses similarly situated to the debtor and transferee." *Loretto Winery*, 107 B.R. at 709.

■ In the leading case on this subject, the Seventh Circuit explained:

[T]he creditor must show that the payment he received was made in accordance with the ordinary business terms in the industry. But this does not mean that the creditor must establish the existence of some single, uniform set of business terms....

... "[O]rdinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed ex-

traordinary and therefore outside the scope of subsection C.

*In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). *Accord In re Cocolat, Inc.*, 176 B.R. 540, 550 (Bankr. N.D.Cal.1995).

■ Although the bankruptcy court initially articulated the correct legal standard, it went on to discuss at some length a different legal standard. It formulated and described a "reasonable creditor" standard and declared what practices a reasonable creditor *should* engage in, focusing on notice to the lienholder that a vehicle had been traded in. Ganis understandably complains that the court set forth a subjective view of how it thought the lenders in this industry ought to be more diligent in protecting their collateral. Indeed, the court was somewhat disapproving of what it perceived as a nonchalant attitude lenders exhibit even after they learn that their collateral has been sold without their being paid.

But that being said, the court also found, from the evidence presented, an objective standard that applies in the industry. The objective standard tests what the normal practices *are* in an industry with regard to payment. The objective nature of the standard comes from considering standards in the industry as a whole instead of simply looking at standards of practice that have developed between the one particular creditor and the debtor.

■ The court made a finding that the ordinary course of business standard is met if the dealer pays off the lienholder within 45 days of trade-in or within 20 days of receipt of funds from the third party purchaser. Although the finding is part of a paragraph discussing the fact that, after lenders have notice that their collateral is on a dealer's lot, they "must take reasonable affirmative steps to preserve their security" (245 B.R. at 389), it is a finding nevertheless. Because that finding is supported by the testimony of Mr.

Russell, it is not clearly erroneous and we cannot disturb it on appeal.

■ Ganis did not articulate in its brief or argument any criteria against which to measure whether the payments by debtor were "ordinary in relation to prevailing business standards," *Food Catering*, 971 F.2d at 398, once outside the two time periods, nor point to any evidence that might suggest such criteria. That it may be ordinary or normal for a creditor in Ganis' situation to do nothing does not establish that it was ordinary for debtor to have made the payments in question, which is the issue. Applying the standard the bankruptcy court found to the facts before us, both payments to Ganis fell outside the 20–day maximum time for pay-off following a dealer's receipt of the funds from its buyer. Accordingly, Ganis's ordinary course of business defense fails.

If this is a harsh result in the industry because it forces unknowing lenders to surrender preferences when they do exactly what they can and must do—hold their liens until payoff—the remedy is not in asking us to ignore the plain language of § 547(c). It is within the power of Ganis and other lenders similarly situated in the industry to police their collateral more diligently, thus precluding dealers such as debtor from floating the proceeds of their collateral for as long as occurred here.

### 3. *Other Issues*

■ Ganis also contends that there was never a debt between it and debtor because Ganis never made a demand for return of the vehicles. The bankruptcy court had previously ruled on summary judgment that the payments were made to Ganis "as a creditor of the Debtor" and that those payments were preferential transfers pursuant to § 547(b). That decision was neither appealed, nor the summary judgment papers included in Ganis's excerpts of the record, nor does Ganis argue that summary judgment was erroneously granted. Further, the joint pretrial order, to which Ganis stipulated, did not

list this as either an issue of fact or an issue of law. The question is simply not properly before us.

Appellee argues that a creditor's self-serving testimony, without empirical evidence to support it, is insufficient to meet the standard of proof. In light of our decision, we will not address this issue except to note that in a similar context "self-serving" testimony of a representative of a preference defendant about his company's ordinary course of business did not disqualify him under Fed.R.Civ.P. 56(e) and was sufficient to raise a material fact in dispute and defeat a partial summary judgment on a § 547(c)(2) defense. *Kaypro,* 218 F.3d at 1074–75.

## CONCLUSION

Although the bankruptcy court's interesting and well-reasoned analysis went further than it needed to, the court did apply the correct legal standard. Since its findings about the industry practice were not clearly erroneous, we AFFIRM.

PERRIS, Bankruptcy Judge, dissenting:

The majority concludes that the bankruptcy court's decision was based on its finding that the ordinary course of business standard would be met if the dealer paid off the lender within 45 days of trade-in or within 20 days of receipt of funds from a third-party purchaser. Because that finding was supported by the evidence, the majority says we cannot disturb it on appeal.

If that were all that the court found, I might agree. But the court did not stop there. It recognized that the focus in this case is the conduct of the lender after the first 45 days from the date of the trade-in. 245 B.R. at 388. The court concluded that, once more than 45 days had passed from trade-in, the ordinary course standard could still be met if the debtor paid the lender within 20 days of receipt of the resale proceeds of the vehicle. *Id.* at 389. Because debtor had done neither, the

court concluded that the payment was not in the ordinary course of business.

There is no evidence to support a finding that the ordinary course of business in the industry is to take reasonable affirmative steps to preserve the lender's security. The bankruptcy court essentially devised a standard that focused on what practices a reasonable creditor should engage in rather than on the correct standard of "practices common to businesses similarly situated to the debtor and transferee." *Loretto Winery,* 107 B.R. at 709. The court affirmatively rejected as ordinary the possible industry practice to "do nothing" once a dealer possessed and was reselling the vehicle. 245 B.R. at 389. That was error. The question is what the normal practices of an industry *are,* not what the practices reasonably *should be.*

The court's erroneous creation of its own "reasonable creditor" standard, based on what it determined a reasonable secured lender would do in circumstances similar to those in this case, infected its findings and conclusions. I would hold that the bankruptcy court erred by injecting a "reasonable creditor" standard into the ordinary course of business defense.

I respectfully dissent.